# EXHIBIT A

DATED   19 SEPTEMBER 2006


**PORLOCK MARITIME COMPANY LIMITED**

- and -

**TREMAIN SHIPPING COMPANY LIMITED**
as joint and several Borrowers

- and -

**THE BANKS AND FINANCIAL INSTITUTIONS**
listed in Schedule 1
as Lenders

-and-


**CREDIT SUISSE**
as Swap Bank


- and -

**CREDIT SUISSE**
as Agent

- and -

**CREDIT SUISSE**
as Security Trustee

_____

**LOAN AGREEMENT**

_____


Loan Facility of up to US$110,000,000
in two tranches in respect of "ALHASBAH" (tbr "KANPUR") and
"ALDANA" (tbr "BAREILLY")


# HOLMAN FENWICK & WILLAN

## INDEX

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | THE LOAN | 10 |
| 3. | DRAWDOWN | 11 |
| 4. | REPAYMENT | 12 |
| 5. | PREPAYMENT | 13 |
| 6. | INTEREST PERIODS | 15 |
| 7. | INTEREST AND DEFAULT INTEREST | 16 |
| 8. | PAYMENTS | 17 |
| 9. | NO SET-OFF, COUNTERCLAIM OR TAX DEDUCTION | 18 |
| 10. | ACCOUNTS OF THE BANKS | 19 |
| 11. | APPLICATION OF RECEIPTS | 19 |
| 12. | RETENTIONS | 20 |
| 13. | CONDITIONS PRECEDENT | 22 |
| 14. | SECURITY | 23 |
| 15. | REPRESENTATIONS AND WARRANTIES | 23 |
| 16. | UNDERTAKINGS OF THE BORROWERS | 27 |
| 17. | REVIEW OF INSURANCES | 31 |
| 18. | VALUATIONS AND ASSET PROTECTION | 31 |
| 19. | EVENTS OF DEFAULT | 33 |
| 20. | FEES, EXPENSES AND INDEMNITIES | 35 |
| 21. | CHANGES IN CIRCUMSTANCES | 38 |
| 22. | INCREASED COST | 39 |
| 23. | ILLEGALITY | 41 |
| 24. | THE AGENT | 41 |
| 25. | THE SECURITY TRUSTEE | 45 |
| 26. | RETIREMENT OF A SERVICE BANK | 47 |
| 27. | LIMITS OF THE SERVICE BANKS' OBLIGATIONS | 48 |
| 28. | SHARING OF PAYMENTS | 50 |
| 29. | JOINT AND SEVERAL LIABILITY | 51 |
| 30. | ASSIGNMENTS AND TRANSFERS | 52 |
| 31. | SET-OFF | 54 |
| 32. | MISCELLANEOUS | 55 |

33.   FURTHER ASSURANCE ............................................................56
34.   NOTICES ...................................................................................56
35.   APPLICABLE LAW AND JURISDICTION ...........................57
SCHEDULE 1 - LENDERS AND COMMITMENTS ..........................59
SCHEDULE 2 - FORM OF NOTICE OF DRAWDOWN ....................60
SCHEDULE 3 - CONDITIONS PRECEDENT DOCUMENTS AND EVIDENCE.............61
SCHEDULE 4 - FORM OF TRANSFER CERTIFICATE.....................64
SCHEDULE - ADMINISTRATIVE DETAILS OF TRANSFEREE LENDER....................67
SCHEDULE 5 - DETAILS OF THE VESSELS.....................................68

**THIS AGREEMENT** is made on    19    September 2006

**BETWEEN:**

1.  **PORLOCK MARITIME COMPANY LIMITED** and **TREMAIN SHIPPING COMPANY LIMITED** as joint and several Borrowers;

2.  **THE BANKS AND FINANCIAL INSTITUTIONS** listed in Schedule 1 as Lenders;

3   **CREDIT SUISSE** as Swap Bank;

4.  **CREDIT SUISSE** as Agent; and

5.  **CREDIT SUISSE** as Security Trustee.

**WHEREAS:**

The Lenders have agreed to make available to the Borrowers, as joint and several borrowers, a loan facility of up to $110,000,000 in two Tranches to assist them in financing the purchase of each Vessel which is to be purchased by the relevant Borrower from the relevant Seller.

**IT IS AGREED AS FOLLOWS:**

1.  **DEFINITIONS AND INTERPRETATION**

1.1  **Definitions**

1.2  In this Agreement, including the Recital, the following expressions shall have the following meanings:

"**Account Security**" means a deed creating security in respect of the Earnings Accounts to be executed by the Borrowers in such form as the Agent may, with the Majority Lenders' authority, approve or require;

"**Advance**" means an Advance of either Tranche made pursuant to Clause 2.1 or Clause 2.2 and, as the context may require, means the principal amount thereof outstanding from time to time;

"**Agent**" means Credit Suisse, a bank incorporated in Switzerland, whose registered office is at St. Alban-Graben 1-3, CH-4002 Basel, Switzerland, subject to the provisions of Clause 26;

"**Applicable Margin**" means, in relation to Tranche A, one point one zero per cent (1.10%) and, in relation to Tranche B, two point one zero per cent. (2.1%) per annum;

"**Appraised Market Value**" means, in relation to a Vessel, the value of that Vessel determined in accordance with Clause 18 and "**Appraised Market Value of the Vessels**" means the aggregate of the Appraised Market Values of the Vessels;

"**Approved Management Agreement**" means, in relation to a Vessel, any agreement for the time being in force between the Borrower which owns, or is to own, that Vessel and the relevant Approved Manager with respect to the management of that Vessel and which has been approved by the Agent;

"**Approved Manager**" means, in relation to a Vessel, any company which the Agent may, with the Majority Lenders' authority, from time to time approve as the manager of that Vessel;

**"Approved Manager's Undertaking"** means, in relation to each Vessel, the undertaking to be executed by the relevant Approved Manager with respect to the management of that Vessel and the rights of the Banks in such form as the Agent may, with the Majority Lenders' authority, approve or require;

**"Bank"** means any of the Lenders, the Swap Bank, the Agent or the Security Trustee;

**"Banking Day"** means a day (excluding Saturdays and Sundays) on which dealings in deposits in Dollars may be carried out in the London Interbank Market and on which banks and foreign exchange markets are open for business in London, Basel and (if a payment or other dealing is required to be made on that day) in New York City and (in the case of payment) the place to which such payment is required to be made;

**"Borrower"** means either of Porlock or Tremain and **"Borrowers"** means both of them;

**"Breakage Costs"** means, in the case of any prepayment of the whole or any part of the Loan on a day other than the last day of an Interest Period applicable to the whole of the amount prepaid, such amount as shall be certified by the Agent, based on a certificate from any relevant Lender, as being necessary to compensate any Lender whose Contribution is being prepaid in whole or in part for any loss (including, without limitation, loss of profit), penalty or expense incurred or to be incurred by that Lender on account of funds borrowed in order to make, fund or match its Commitment or Contribution (or any part thereof);

**"Classification"** means, in relation to a Vessel, the classification specified for that Vessel in Schedule 5 or such other classification as may from time to time be approved in writing by the Agent;

**"Classification Society"** means, in relation to a Vessel, the classification society specified for that Vessel in Schedule 5 or such other classification society as may from time to time be approved in writing by the Agent;

**"Commitment"** means, in relation to a Lender, the amount set out opposite its name in Schedule 1, or, as the case may be, the amount specified in any Transfer Certificate, to the extent not reduced, cancelled, terminated or transferred in accordance with the provisions of this Agreement, and **"Total Commitments"** means the aggregate of the Commitments of all the Lenders;

**"Commitment Period"** means the period commencing on the date of this Agreement and ending on the earlier of (a) 30 October, 2006, (b) the final Drawdown Date and (c) the date on which the Commitments of the Lenders are cancelled;

**"Contribution"** means, in relation to a Lender in respect of the Loan or Tranche or any other amount, the part of the Loan or Tranche or such other amount owing to that Lender at any relevant time;

**"Corporate Guarantee"** means the guarantee of the obligations of the Borrowers to be executed by the Corporate Guarantor in such form as the Agent may, with the Majority Lenders' authority, approve or require;

**"Corporate Guarantor"** means Mandate Shipping Company Limited, a company incorporated under the laws of the Republic of Cyprus;

**"Credit Support Document"** has the meaning given to that expression in Section 14 of the Master Agreement;

**"Credit Support Provider"** has the meaning given to that expression in Section 14 of the Master Agreement;

**"Default Rate"** means the annual rate of interest determined in accordance with Clause 7.3;

**"Dollars"** (and the sign **"$"**) means the lawful currency for the time being of the United States of America;

**"Drawdown Date"** means each of the Banking Days on which the Borrowers specify that they wish an Advance to be made available or (as the context requires) the date on which such Advance is actually advanced to the Borrowers;

**"Early Termination Date"** has the meaning given to that expression in Section 14 of the Master Agreement;

**"Earnings"** means, in relation to a Vessel, all moneys whatsoever (and all claims for such moneys) due or to become due to or for the account of its owner at any time during the Security Period arising out of the use of or operation of that Vessel, including (but not limited to) all freight, hire and passage moneys, compensation payable to its owner in the event of requisition of that Vessel for hire, remuneration for salvage and towage services, demurrage and detention moneys, contributions in general average, damages for breach (or payments for variation or termination) of any charterparty or other contract for employment of that Vessel, together with the benefit of any guarantee, indemnity or other security which may at any time be given to its owner as security for the payment of such moneys;

**"Earnings Account"** and **"Earnings Accounts"** have the meanings given to them in Clause 12.1;

**"Encumbrance"** means any mortgage, charge, (whether fixed or floating), pledge, lien, hypothecation, assignment, trust arrangement or security interest or other encumbrance of any kind securing any obligation of any person or having the effect of conferring security or any type of preferential arrangement (including, without limitation, title transfer and/or retention arrangements having a similar effect);

**"Environmental Affiliate"** means any agent or employee of either Borrower or any other Obligor, or any other person having a contractual relationship with either Borrower or any other Obligor in connection with any Relevant Ship or its operation or the carriage of cargo and/or passengers thereon and/or the provision of goods and/or services on or from the Relevant Ship;

**"Environmental Approval"** means any permit, licence, approval, ruling, exemption or other authorisation required under applicable Environmental Laws;

**"Environmental Claim"** means:

(a)     any claim by, or directive from, any applicable governmental, judicial or other regulatory authority alleging breach of, or non-compliance with, any Environmental Laws or Environmental Approvals or otherwise howsoever relating to or arising out of an Environmental Incident; or

(b)     any claim by any other person howsoever relating to or arising out of an Environmental Incident

(and, in each such case, **"claim"** shall mean a claim for damages, clean-up costs, compliance, remedial action or otherwise);

**"Environmental Incident"** means:

(a)    any release, discharge, disposal or emission of Material of Environmental Concern from a Relevant Ship; or

(b)    any incident in which Material of Environmental Concern is released, discharged, disposed of, or emitted by or from a ship other than a Relevant Ship and which involves collision between a Relevant Ship and such other ship, or some other incident of navigation or operation, in either case where a Relevant Ship, any of the Obligors or the managers of the Relevant Ship is or are actually or allegedly at fault or otherwise liable (in whole or in part); or

(c)    any incident in which Material of Environmental Concern is released, discharged, disposed of, or emitted by or from a ship other than a Relevant Ship and where the Relevant Ship is actually or potentially liable to be arrested or attached  as a result and/or where any of the Obligors or the managers of the Relevant Ship is or are actually or allegedly at fault or otherwise liable;

**"Environmental Laws"** means all national and international laws, ordinances, rules, regulations, rules of common law, conventions and agreements pertaining to pollution or protection of human health or the environment (including, without limitation, the United States Oil Pollution Act of 1990 and any comparable laws of the individual States of the United States of America);

**"Event of Default"** means any of the events listed in Clause 19.1;

**"Financial Indebtedness"** means any indebtedness in respect of:

(a)    moneys borrowed or raised and interest thereon;

(b)    any bond, bill of exchange, note, loan stock, debenture, commercial paper or similar security or instrument;

(c)    acceptance, documentary credit or guarantee facilities;

(d)    deferred payments for assets or services acquired;

(e)    rental payments so far as attributable to payment of capital under finance leases, whether in respect of land, buildings, machinery or equipment or otherwise;

(f)    payments under hire purchase contracts;

(g)    factored debts, to the extent that there is recourse;

(h)    guarantees, bonds, standby letters of credit or other instruments issued in connection with the performance of contracts or obligations;

(i)    any interest or currency swap or any other form of derivative transaction;

(j)    guarantees, indemnities or other assurances against financial loss in respect of indebtedness of any person falling within any of paragraphs (a) to (i) inclusive above; and

(k)    amounts raised or obligations incurred under any other transaction having the commercial effect of any of the above;

"**General Assignment**" means, in relation to a Vessel, the assignment of the Insurances, Earnings and Requisition Compensation of that Vessel to be executed by the relevant Borrower in such form as the Agent may, with the Majority Lenders' authority, approve or require;

"**Indebtedness**" means any obligation for the payment or repayment of moneys, whether present or future, actual or contingent, sole or joint;

"**Initial Charters**" means the time charters in respect of the Vessels or, as the case may be, one of the Vessels and having a duration of at least one hundred and two (102) months in aggregate and on such terms and with a charterer (each an "**Approved Charterer**") approved by the Agent and "**Initial Charter**" means the relevant one of them;

"**Insurances**" means, in relation to a Vessel, all policies and contracts of insurance (including all entries of that Vessel in a protection and indemnity association and a war risks association) which are from time to time taken out or entered into in respect of that Vessel or its Earnings or otherwise howsoever (as specified in greater detail in the Security Documents) and all benefits of such policies and contracts, including all claims of whatsoever nature and return of premiums;

"**Interest Date**" means a date upon which interest is due and payable in accordance with Clause 7.1;

"**Interest Period**" means each period determined in accordance with Clause 6 or Clause 21, as the case may be;

"**Interest Rate**" means the annual rate of interest which is determined by the Agent in accordance with Clause 7.2 or Clause 21, as the case may be;

"**Lender**" means:

(a)    any of the banks and financial institutions listed in Schedule 1, unless it has delivered as transferor a Transfer Certificate or Certificates in respect of the whole of its Commitment or its Contribution; and

(b)    a bank or financial institution holding a Transfer Certificate;

"**LIBOR**" means, in relation to an Interest Period or any other relevant period:

(a)    the rate per annum that appears on Telerate Page 3750 at or about 11.00 a.m. (London time) two (2) London Banking Days before the commencement of that period for deposits in Dollars in an amount comparable with the amount of the Loan or part thereof or other relevant sum for a period equivalent to that period for delivery on the first Banking Day of such period; or

(b)    if no display rate is then displayed or if the Agent determines that no rate for a period comparable in duration with the relevant period is displayed on Telerate Page 3750 for Dollars, the arithmetic mean (rounded upwards to the nearest one sixteenth of one per cent (1/16%)) of the rates per annum, as supplied to the Agent at its request, quoted by the Lenders to leading banks in the London Interbank Market at or about 11.00 a.m. London time two (2) London Banking Days before the commencement of that period for the offering of deposits in Dollars of an amount comparable with the amount of their respective Commitments or Contributions or relevant part thereof (as the case may be) at the commencement of such period for a period comparable with such period fixed for its duration);

and, for the purposes of this definition, **"Telerate Page 3750"** means the display designated as **"Page 3750"** on the Telerate Service (or other such page as may replace Page 3750 on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for deposits in Dollars);

**"Loan"** means the sum of up to one hundred and ten million Dollars ($110,000,000) to be advanced by the Lenders to the Borrowers under this Agreement in two Tranches and, as the context may require, means the principal amount from time to time outstanding under this Agreement;

**"Majority Lenders"** means:

(a)     before any Advance has been advanced, Lenders the aggregate of whose Commitments at any relevant time exceeds sixty six per cent (66%) of the Total Commitments at such time; and

(b)     after an Advance has been advanced, Lenders the aggregate of whose Contributions at any relevant time exceeds sixty six per cent (66%) of such Advance;

**"Master Agreement"** means the Master Agreement (on the 1992 ISDA (Multicurrency-crossborder form as modified) made or to be made between the Swap Bank and the Borrowers and includes all transactions from time to time entered into and confirmations from time to time exchanged under the Master Agreement and any amending, supplementing or replacement agreement made from time to time which Master Agreement shall only be entered into with the consent of the Lenders;

**"Master Agreement Security Agreement"** means the deed containing, inter alia, a charge in respect of the Master Agreement executed or to be executed by the Borrowers in favour of the Swap Bank in such form as the Swap Bank may approve or require;

**"Master Agreement Liabilities"** means, at any relevant time, all liabilities actual or contingent, present or future, of the Borrowers to the Swap Bank under the Master Agreement;

**"Material of Environmental Concern"** means and includes chemicals, pollutants, contaminants, waste, toxic or hazardous substances, oil, petroleum and oil and petroleum products and any other polluting substances, the release, discharge, disposal or emission of which into the environment is regulated, prohibited or penalised by or pursuant to any Environmental Law;

**"Minimum Balance"** has the meaning given to such term in Clause 12.11;

**"MOA"** means, in relation to a Vessel, the memorandum of agreement entered into between the relevant Seller and the relevant Borrower for the sale and purchase of that Vessel;

**"Mortgage"** means, in relation to a Vessel, the first preferred Liberian ship mortgage over that Vessel to be executed by the relevant Borrower in such form as the Agent may, with the Majority Lenders' authority, approve or require;

**"Notice of Drawdown"** means a notice in the form set out in Schedule 2;

**"Obligor"** means any party from time to time to any of the Security Documents, other than any Bank;

**"Operating Expenses"** means, in relation to a Vessel, the customary costs and expenses from time to time incurred by or on behalf of the Borrower owning that Vessel in connection with the operation of that Vessel, such costs and expenses always to be substantiated to the satisfaction, and at the request, of the Agent;

**"Outstanding Indebtedness"** means the aggregate of the Loan, the Master Agreement Liabilities, all interest accrued on the Loan, and all other sums of money whatsoever from time to time due or owing actually or contingently to the Banks (or any of them) under or pursuant to the Security Documents;

**"Permitted Encumbrance"** means:

(a)     any Encumbrance created by or pursuant to the Security Documents;

(b)     liens on a Vessel for crew's wages or salvage or otherwise arising in the normal course of trading and being regularly settled, the total amount of such lien or liens not to be material to the security created in favour of the Banks pursuant to the Security Documents in respect of that Vessel;

**"Porlock"** means Porlock Maritime Company Limited, a corporation incorporated under the laws of the Republic of Liberia and having its registered office at 80 Broad Street, Monrovia, Liberia;

**"Potential Event of Default"** means an event or circumstance which, with the giving of any notice, lapse of time, determination of the Agent or the Majority Lenders in accordance with the relevant provisions of this Agreement and the other Security Documents or satisfaction of any other condition would constitute an Event of Default;

**"Relevant Ship"** means either Vessel and any other ship from time to time (whether before or after the date of this Agreement) owned, managed or crewed by, or chartered to, any Obligor;

**"Repayment Date"** means each of the Banking Days upon which a Repayment Instalment is due and payable in accordance with Clause 4.2;

**"Repayment Instalment"** means, in relation to a Tranche, each of the instalments of each Advance becoming due on a Repayment Date in accordance with Clause 4.1;

**"Requisition Compensation"** means, in relation to a Vessel, all moneys or other compensation payable during the Security Period by reason of requisition for title or other compulsory acquisition of that Vessel otherwise than by requisition for hire;

**"Security Documents"** means this Agreement, the Master Agreement, the documents specified in Clause 14 and any and every other document from time to time executed to secure, or to establish a subordination or priorities arrangement in relation to, all or any of the obligations of any person to the Banks (or any of them) under this Agreement or any other Security Documents;

**"Security Period"** means the period from the date of this Agreement until the discharge of the security created by the Security Documents by final and irrevocable repayment or payment in full of the Outstanding Indebtedness;

**"Security Trustee"** means Credit Suisse, a bank incorporated in Switzerland, whose registered office is at St. Alban-Graben 1-3, CH-4002 Basel, Switzerland subject to the provisions of Clause 26;

"**Seller**" means Qatar Shipping Company, PO Box 22180, 3rd Floor, HSBC Building 810, Abdullah bin Jasim Street, Doha, Qatar;

"**Service Bank**" means the Agent or the Security Trustee;

"**Swap Bank**" means Credit Suisse, a bank incorporated in Switzerland, whose registered office is at St. Alban-Graben 1-3, CH-4002 Basel, Switzerland;

"**Total Loss**" means, in relation to a Vessel, (a) actual, constructive, compromised, agreed or arranged total loss of that Vessel; or (b) requisition for title or other compulsory acquisition of that Vessel, otherwise than by requisition for hire; or (c) capture, seizure, arrest, detention or confiscation of that Vessel, by any government or by any persons acting or purporting to act on behalf of any government, unless that Vessel be released and restored to its owner within one (1) month thereafter;

"**Total Loss Date**" means, in relation to a Vessel, the date upon which a Total Loss of that Vessel shall be deemed to have occurred, being:

(a)     if it consists of an actual loss, at noon London time on the actual date of loss or, if that is not known, on the date when that Vessel was last heard of;

(b)     if it consists of a requisitioning for title, at noon London time on the date on which the requisition is expressed to take effect by the person requisitioning that Vessel; and

(c)     if it consists of a constructive or compromised or arranged or agreed Total Loss, at noon London time on the earliest of:

    (i)     the date on which notice of abandonment of that Vessel is given to its insurers;

    (ii)     if her insurers do not admit the claim for Total Loss, the actual date of loss or alleged loss; and

    (iii)     the date of any compromise, arrangement or agreement entered into by or on behalf of the relevant Borrower with that Vessel's insurers in respect of the Total Loss;

"**Tranche**" means Tranche A or Tranche B and, as the context may require, means the principal amount thereof outstanding from time to time under this Agreement and "**Tranches**" means both of them;

"**Tranche A**" means, in relation to each Vessel, the sum of up to fifty million and four hundred thousand Dollars ($50,400,000) to be advanced by the Lenders to the Borrowers under this Agreement in two Advances pursuant to Clause 2.1 and, as the context may require, means the principal amount from time to time outstanding under this Agreement;

"**Tranche B**" means, in relation to each Vessel, the sum of up to four million and six hundred thousand Dollars ($4,600,000) to be advanced by the Lenders to the Borrowers under this Agreement in two Advances pursuant to Clause 2.2 and, as the context may require, means the principal amount from time to time outstanding under this Agreement;

"**Transaction**" means a Transaction as defined in the introductory paragraph of the Master Agreement;

"**Transfer Certificate**" means a transfer certificate in the form set out in Schedule 4 with any modifications or amendments approved or required by the Agent;

"**Transaction Document**" means any MOA the Initial Charters or any Approved Management Agreement in respect of a Vessel; and

"**Tremain**" means Tremain Shipping Company Limited, a corporation incorporated under the laws of the Republic of Liberia and having its registered office at 80 Broad Street, Monrovia, Liberia;

"**Vessel**" means either of m.v. "ALHASBAH" (tbr "KANPUR") and m.v. "ALDANA" (tbr "BAREILLY"), further particulars of which are set out in Schedule 5 and "**Vessels**" means both of them.

1.3   The following expressions shall be construed in the following manner:

"**Lender**", "**Agent**", "**Security Trustee**", "**Swap Bank**" and "**Bank**" include their respective successors and assigns;

"**Borrower**", "**Corporate Guarantor**" and "**Obligor**" include their respective legal personal representatives, administrators, successors and permitted assigns;

"**person**" includes a corporate entity and any body of persons, corporate or unincorporate;

"**subsidiary**" and "**holding company**" have the meanings given to them by Section 736 of the Companies Act 1985;

"**taxes**" includes all present and future income, corporation and value-added taxes and all stamp and other taxes, duties, levies, imposts, deductions, charges and withholdings whatsoever, together with interest thereon and penalties with respect thereto, if any, and any payments of principal, interest, charges, fees or other amounts made on or in respect thereof, and references to "**tax**" and "**taxation**" shall be construed accordingly; and

"**associate**" has the meaning given to it by Section 435 of the Insolvency Act 1986.

1.4   Unless the context otherwise requires, words in the singular include the plural and vice versa.

1.5   References to any document include the same as varied, supplemented or replaced from time to time.

1.6   References to any enactment include re-enactments, amendments and extensions thereof.

1.7   Clause headings are for convenience of reference only and are not to be taken into account in construction.

1.8   Unless otherwise specified, references to Clauses, Recitals and Schedules are respectively to Clauses of and Recitals and Schedules to this Agreement.

1.9   In this Agreement, references to periods of "**months**" shall mean a period beginning in one calendar month and ending in the relevant calendar month on the day numerically corresponding to the day of the calendar month in which such period started, provided that (a) if such period started on the last Banking Day in a calendar month, or if there is no such numerically corresponding day, such period shall end on the last Banking Day in the relevant calendar month and (b) if such numerically corresponding day is not a Banking Day, such period shall end on the next following Banking Day in the same calendar month, or if there is no such Banking Day, such period shall end on the preceding Banking Day (and "**month**" and "**monthly**" shall be construed accordingly).

1.10   A person who is not a party to this Agreement may not enforce, or otherwise have the benefit of, any provision of this Agreement under the Contracts (Rights of Third Parties) Act 1999.

## 2.   THE LOAN

### 2.1   Advance of Tranche A

Subject to the provisions of this Agreement, the Lenders agree to make available to the Borrowers Tranche A in an amount not exceeding $100,800,000 divided into two (2) Advances as follows:

2.1.1   an amount not exceeding the lower of (a) 70% of the Appraised Market Value of m.v. "ALHASBAH" (tbr "KANPUR") and (b) $50,400,000 which is to be applied by Tremain in paying (in part) the amount required to be paid by Tremain to the Seller pursuant to the relevant MOA in relation to the purchase by Tremain of such Vessel; and

2.1.2   an amount not exceeding the lower of (a) 70% of the Appraised Market Value of m.v. "ALDANA" (tbr "BAREILLY") and (b) $50,400,000 which is to be applied by Porlock in paying (in part) the amount required to be paid by Porlock to the Seller pursuant to the relevant MOA in relation to the purchase by Porlock of such Vessel.

### 2.2   Advance of Tranche B

Subject to the provisions of this Agreement, the Lenders agree to make available to the Borrowers Tranche B in an amount not exceeding $9,200,000 divided into two (2) Advances as follows:

2.2.1   an amount not exceeding the lower of (a) 6.4% of the Appraised Market Value of m.v. " ALHASBAH " (tbr "KANPUR") and (b) $4,600,000 which is to be applied by Tremain in paying (in part) the amount required to be paid by Tremain to the Seller pursuant to the relevant MOA in relation to the purchase by Tremain of such Vessel; and

2.2.2   an amount not exceeding the lower of (a) 6.4% of the Appraised Market Value of m.v. "ALDANA" (tbr "BAREILLY") and (b) $4,600,000 which is to be applied by Porlock in paying (in part) the amount required to be paid by Porlock to the Seller pursuant to the relevant MOA in relation to the purchase by Porlock of such Vessel.

### 2.3   Availability

Each Tranche will be available to be drawn in two Advances on its respective Drawdown Date and shall be applied exclusively for the purposes referred to in Clauses 2.1 and 2.2, provided that no Bank shall be bound to monitor or verify the application of the proceeds of any Advance.

### 2.4   Lenders' Participations

Subject to the provisions of this Agreement, each Lender will participate in each Tranche up to an aggregate maximum principal amount not exceeding its Commitment and in the proportion which its Commitment bears to the Total Commitments.  No Lender is obliged to lend more than its Commitment.

### 2.5   No advance after expiry of Commitment Period

No Lender will have any liability whatsoever to make available its Commitment or any part thereof after the date of the expiry of the Commitment Period and any part of any Lender's Commitment which has not been advanced to the Borrowers at close of business on such date shall be cancelled.

## 2.6   Obligations of Lenders several

The obligations of each Lender under this Agreement and the other Security Documents are several and, accordingly:

2.6.1   no Lender shall be liable for the failure of any other Lender to perform its obligations under this Agreement or any of the other Security Documents; and

2.6.2   the failure of a Lender to perform any of its obligations under this Agreement or any of the other Security Documents shall not relieve any other Bank or any Obligor from any of their respective obligations hereunder or thereunder.

## 2.7   Rights of Lenders several

The rights and interests of each Lender under this Agreement and the other Security Documents are several and, accordingly, notwithstanding any provision to the contrary herein or therein:

2.7.1   the aggregate of the amounts outstanding at any time under this Agreement and the other Security Documents to each Lender shall be due as a separate and independent debt; and

2.7.2   each Lender shall have the right to sue for any amount due and payable to it from either Borrower or any other Obligor under this Agreement or any of the other Security Documents and it shall not be necessary for any other Bank to be joined as an additional party in any proceedings to that end.

## 2.8   Restrictions on other proceedings by individual Lenders

No Lender shall, except with the prior written consent of the Majority Lenders, bring any proceedings against either Borrower or any other Obligor in respect of any other claim (whether in contract, tort or otherwise) which that Lender may have under or in connection with this Agreement or any of the other Security Documents.

## 3.   DRAWDOWN

## 3.1   Notice of drawdown

The Borrowers may draw an Advance subject to giving the Agent Notice of Drawdown not later than 10:00 a.m. London time three (3) Banking Days before the proposed Drawdown Date, which notice shall:

3.1.1   be effective on receipt by the Agent;

3.1.2   specify the Banking Day during the Commitment Period upon which such Advance is required;

3.1.3   specify the Borrowers' choice of duration of the first Interest Period;

3.1.4   give full details of the place and account, which must be acceptable to the Agent, to which the proceeds of such Advance are to be paid;

3.1.5   constitute a representation and warranty in the terms of Clause 15; and

3.1.6   be irrevocable.

3.2 **Agent's notification to Lenders**

Upon receipt of Notice of Drawdown given in accordance with Clause 3.1, the Agent shall promptly notify each Lender of:

3.2.1    the amount of such Advance;

3.2.2    the amount of that Lender's Commitment;

3.2.3    the Drawdown Date of such Advance; and

3.2.4    the duration of the first Interest Period of such Advance.

3.3 **Availability of Lenders' Commitments**

Each Lender shall, subject to the provisions of this Agreement, make available to the Agent on each Drawdown Date the amount of its Commitment.

3.4 **Conditions precedent**

Notwithstanding the giving of Notice of Drawdown pursuant to Clause 3.1, neither the Lenders nor the Agent shall be obliged to disburse any funds until all the conditions set out in Clause 13 have been satisfied.

3.5 **Application of Loan proceeds**

Subject to the provisions of this Agreement, the Agent will pay to the Borrowers on each Drawdown Date the amounts which the Agent receives from the Lenders under Clause 3.3 in like funds as are received by the Agent from the Lenders by applying the same in accordance with the Notice of Drawdown given by the Borrowers.

3.6 **Deemed Indebtedness**

The payment by the Agent under Clause 3.5 shall constitute the making of each Advance and the Borrowers shall thereupon become indebted, as principal and direct obligors, to each Lender in the amount of each Lender's Contribution.

4. **REPAYMENT**

4.1 **Repayment by instalments**

4.1.1    Subject to the provisions of this Agreement, the Borrowers shall repay each Advance under Tranche A in forty (40) Repayment Instalments, each of seven hundred and eighty-five thousand Dollars ($785,000) together with a balloon instalment of $19,000,000 payable with the fortieth and final such Repayment Instalment. If the full amount of any Advance is not advanced to the Borrowers, the amount of each Repayment Instalment shall be reduced pro rata to the amount actually advanced; and

4.1.2    subject to the provisions of this Agreement, the Borrowers shall repay each Advance under Tranche B in forty (40) Repayment Instalments each of one hundred and fifteen thousand Dollars ($115,000). If the full amount of any Advance is not advanced to the Borrowers, the amount of each Repayment Instalment shall be reduced pro rata to the amount actually advanced.

4.2 **Repayment Dates**

In relation to each Advance, the Repayment Instalments shall be paid on the Banking Days falling at successive three (3) monthly intervals from the date falling three (3) months after the Drawdown Date of such Advance, provided that where the date corresponding numerically with an applicable Drawdown Date is not a Banking Day, the relevant Repayment Date shall fall on the next succeeding Banking Day, unless that Banking Day falls in the next calendar month, in which event the Repayment Date shall be the immediately preceding Banking Day.

4.3 **Final repayment**

On the final Repayment Date the Borrowers shall additionally pay to the Agent all sums which are then accrued or owing to any Bank under any Security Document.

5. **PREPAYMENT**

5.1 **Minimum prepayment and notice**

The Borrowers shall have the right to prepay the Loan, in whole or in part, on any Interest Date subject to the following conditions:

5.1.1 any prepayment of part of the Loan (or any relevant part) must be in a minimum amount or an integral multiple of one hundred thousand Dollars ($100,000); and

5.1.2 the Agent must receive not less than ten (10) Banking Days' notice specifying the amount to be prepaid and the date on which the prepayment is to be made.

5.2 **Agent's notification to other Banks**

The Agent shall promptly notify the other Banks of any notice which is received from the Borrowers under Clause 5.1.

5.3 **Mandatory Prepayment**

If either Vessel becomes a Total Loss the Borrowers shall prepay the Relevant Portion of the Loan in respect of that Vessel on or before the Relevant Date.

For the purposes of this Clause 5.3:

**"Relevant Date"** means, in relation to a Vessel, the date which is the earlier of:

(a) the date one hundred and twenty (120) days after the Total Loss Date; and

(b) the date upon which the insurance proceeds or Requisition Compensation in respect of that Vessel are received by the Agent pursuant to the provisions of the relevant Security Documents; and

**"Relevant Portion"** means, as at any Relevant Date, an amount calculated in accordance with the formula:

$$Relevant\ Portion \quad = Ax \quad \frac{1}{B}$$

where:

A = the amount of the Loan immediately prior to that Relevant Date; and

B      =      the number of Vessels (excluding a Vessel previously sold or lost but including the Vessel lost) immediately prior to that Relevant Date.

**5.4    Conditions of prepayment**

The following shall apply to any prepayment under this Agreement:

5.4.1    each prepayment must be made together with the accrued interest on the amount prepaid and all other sums payable in respect thereof under the provisions of this Agreement and, in the case of prepayment of the whole of the Loan, shall be accompanied by payment of all other Outstanding Indebtedness;

5.4.2    any prepayment of part of the Loan will be applied in or towards, firstly, the discharge of the next following Repayment Instalments in relation to Tranche B and secondly, after Tranche B has been repaid in full, the discharge of the next following Repayment Instalments in relation to Tranche A;

5.4.3    any notice of prepayment given by the Borrowers shall be effective on receipt by the Agent and shall be irrevocable once given and the Borrowers shall be bound to make such prepayment in accordance therewith;

5.4.4    except as specifically provided in this Agreement or in any other of the Security Documents, in the absence of an Event of Default and demand for repayment by the Agent, the Lenders shall not be obliged to accept any other prepayment of the whole or any part of the Loan;

5.4.5    any part of the Loan which is repaid or prepaid by the Borrowers may not be redrawn; and

5.4.6    any prepayment made on a day other than the last day of an Interest Period applicable to the whole amount prepaid shall be made together with any Breakage Costs.

5.5    In the case of a prepayment of all or part of the Loan, Tranche or Advance under this Agreement then, subject to Clause 5.6, the Swap Bank shall be entitled but not obliged to amend, supplement, cancel, net out, transfer or assign all or such part of the rights, benefits and obligations created by the Master Agreement which equate or relate to the part of the Loan, Tranche or Advance so prepaid and/or to obtain or re-establish any hedge or related trading position relating to such part of the Loan or Tranche in any manner and with any person the Swap Bank in its absolute discretion decides, and in the case of a partial prepayment and the Swap Bank exercising any part of its entitlement as aforesaid the Borrowers continuing obligations under the Master Agreement shall, unless agreed otherwise by the Swap Bank, be calculated so far as the Swap Bank considers it practicable by reference to the amended repayment schedule for the relevant Tranche taking account of the fact that less than the full amount of the Loan remains outstanding.

5.6    If:

(a)    less than the full amount of the Loan remains outstanding following prepayment under this Agreement; or

(b)    less than the full amount of the Loan is drawndown under this Agreement, and the Swap Bank in its absolute discretion agrees, following a written request of the Borrowers, that the Borrowers may be permitted to maintain all or part of a Transaction in an amount not wholly matched with or linked to all or part of the Loan, the Borrowers shall within ten (10) days of being notified by the Swap Bank of such requirement provide the Swap Bank with, or procure the provision of the Swap Bank of, such additional security as shall

in the opinion of the Swap Bank be adequate to secure the performance of such Transaction, which additional security shall take such form, be constituted by such documentation, and be entered into between such parties, and each document comprising such additional security shall constitute a Credit Support Document.

5.7     The Borrowers shall on the first written demand of the Swap Bank indemnify the Swap Bank in respect of all loss, cost and expense (including the fees of legal advisers) incurred or sustained by the Swap Bank as a consequence of or in relation to the effecting of any matters or transactions referred to in Clauses 5.5 and 5.6.

5.8     In the event that the Swap Bank exercises any of its rights under Clause 5.5 or 5.6 and such exercise results in all or part of a Transaction being terminated such termination shall be treated under the Master Agreement in the same manner as if it were a Terminated Transaction (as defined in section 14 of the Master Agreement) effected by the Swap Bank after an Event of Default by the Borrowers and, accordingly, the Swap Bank shall be permitted to recover from the Borrowers a payment for early termination calculated in accordance with the provisions of section 6(e)(i) of the Master Agreement.

## 6.     INTEREST PERIODS

### 6.1     Borrowers' selection of Interest Periods

Subject to Clause 6.2 and to the other provisions of this Agreement, the Borrowers may, by giving notice in writing to the Agent not later than 10.00 a.m. London time three (3) Banking Days before the first day of each Interest Period, select the duration (being a period of three (3), six (6), nine (9) or twelve (12) months or such other period longer than six (6) months as the Borrowers may select and the Agent, with the Majority Lenders' authority, may agree) of that Interest Period.

### 6.2     Determination of duration

In relation to each Advance, the following shall apply in determining the duration of an Interest Period:

6.2.1     the first Interest Period shall commence on the Drawdown Date thereof;

6.2.2     each subsequent Interest Period shall commence on the last day of the immediately preceding Interest Period;

6.2.3     the Borrowers shall make each selection under this Clause 6.2 (and in the case of the duration of the Interest Period being determined in accordance with Clause 6.2.4 below shall be deemed to have selected the period so determined) in such manner as to ensure that, in the event that any Repayment Date falls within the Interest Period so selected, a separate Interest Period is selected in respect of the part of the Advance due to be repaid under Clause 4 on such Repayment Date, the expiry of which period coincides with the relevant Repayment Date (and for this purpose alone the Borrowers shall be entitled to select Interest Periods of different lengths in relation to such Advance);

6.2.4     in the absence of any such selection by the Borrowers of the duration of an Interest Period, or if the Agent (after consultation with the Lenders) shall certify to the Borrowers that the funds requested are not available for an Interest Period of the duration selected by the Borrowers, the duration of that Interest Period shall (subject as provided in this Clause 6.2) be three (3) months or such other period as the Agent (after consultation with the Lenders) may specify;

6.2.5   if the last day of any Interest Period would otherwise fall on a day which is not a Banking Day, that Interest Period shall be extended (subject to Clause 6.2.6 below) so as to end on the next succeeding Banking Day, unless by virtue of such extension the Interest Period would end in the next calendar month, in which case it shall be shortened so as to end on the immediately preceding Banking Day; and

6.2.6   no Interest Period shall extend beyond the final Repayment Date.

### 6.3   Agent's notification of Interest Period

The Agent will notify the other Banks and the Borrowers of each determination of the duration of an Interest Period promptly upon the determination thereof.

## 7.   INTEREST AND DEFAULT INTEREST

### 7.1   Interest Dates

Subject to the provisions of this Agreement, the Borrowers shall pay interest on each Tranche, or any part thereof (as the case may be), at the Interest Rate applicable thereto in arrears on the last day of each Interest Period applicable thereto, except in the case of an Interest Period longer than three (3) months where interest shall be paid every three (3) months during that Interest Period and on the last day of that Interest Period.

### 7.2   Interest Rate

Subject to the provisions of this Agreement, the Interest Rate applicable to each Tranche or any part thereof (as the case may be) for each Interest Period relating thereto will be the annual rate of interest determined by the Agent to be the aggregate of (a) the Applicable Margin and (b) LIBOR for that Interest Period.

### 7.3   Default interest

Without prejudice to any other remedy of the Lenders, if the Borrowers fail to pay on the due date any sum (whether of principal, interest or otherwise) due under any one or more of the Security Documents, interest will accrue, and become payable upon demand by the Agent, upon the sum unpaid from and including the date upon which it fell due for payment until the date of actual payment by the Borrowers (as well after as before judgment) at the rate per annum determined by the Agent to be equal to two per cent. (2%) plus whichever is the higher of:

7.3.1   the rate of interest applicable to the sum unpaid (if of principal) immediately prior to its due date, provided that such rate shall apply only for any unexpired portion of the Interest Period relating to such overdue principal and thereafter the rate applicable to such overdue principal shall be determined in accordance with Clause 7.3.2 below for so long as the default continues; and

7.3.2   the aggregate of the Applicable Margin and LIBOR for periods of such duration as the Agent may, after consultation with the Lenders, determine from time to time.

For so long as the default continues such rate of interest shall be recalculated on a similar basis at the end of each successive period so determined by the Agent. Any such interest which is not paid when due shall be compounded at the end of each such Interest Period or other period determined by the Agent for so long as it remains unpaid.

7.4 **Agent's notification of rate of interest**

The Agent will notify the other Banks and the Borrowers of each determination of a rate of interest under this Agreement and any of the other Security Documents promptly upon the determination thereof.

7.5 **Lenders to provide quotations**

Each Lender shall use all reasonable endeavours promptly to provide the Agent whenever so required with the necessary quotation for the purposes of fixing a rate of interest under this Agreement. If any Lender fails to provide the Agent with any such quotation, the applicable rate of interest shall be based on the quotations supplied by the other Lenders, provided that if all the Lenders fail to provide a quotation then the applicable rate of interest shall be determined in accordance with Clause 21.5.

8. **PAYMENTS**

8.1 **Place of payment**

Unless otherwise specified by the Agent, all moneys to be paid by the Lenders to the Agent or by the Borrowers to any Bank under this Agreement and any of the other Security Documents shall be paid to the Agent, or the Security Trustee in the case of an amount payable to it:

8.1.1 by not later than 10.00 a.m. (London time);

8.1.2 on their due date in Dollars, in funds which are for same day settlement in the New York Clearing House Interbank Payments System (or in such other Dollar funds as shall for the time being be customary for settlement of international banking transactions in Dollars);

8.1.3 in the case of an amount payable to the Agent or the Lenders, to an account of the Agent, with Credit Suisse First Boston, Zurich, beneficiary: Credit Suisse Ship Finance, at its Account No. 0073-9500000-98-780 with Credit Suisse, Basel, (MT100 S.W.I.F.T. CRESCHZZ40A) under reference Porlock/Tremain or to such other account as the Agent may from time to time notify the Borrowers and the other Banks; and

8.1.4 in the case of a payment to the Security Trustee, to such account as it may from time to time notify the Borrowers and the other Banks.

8.2 **Availability of funds conditional upon receipt by Agent**

The Agent shall not be obliged to make available to any of the parties hereto any amount which it is due to receive for the account of that party unless it is satisfied that it has unconditionally received the funds concerned.

8.3 **Refunds by Borrowers**

Without prejudice to Clause 8.2, if the Agent makes an amount available to the Borrowers which has not (but should have) been made unconditionally available to the Agent by a Lender, the Borrowers shall on demand refund such amount to the Agent.

8.4 **Refunds by Banks**

Without prejudice to Clause 8.2, if the Agent makes an amount available to a Lender or the Security Trustee which has not (but should have) been paid to the Agent by the Borrowers, such Lender or the Security Trustee (as appropriate) shall:

8.4.1   on demand refund such amount to the Agent; and

8.4.2   pay to the Agent on demand such further amount (as conclusively certified by the Agent) as shall indemnify the Agent against any cost, loss, liability or expense suffered or incurred by the Agent as a result of its having made available such amount to that Lender or the Security Trustee (as appropriate) before receiving it from the Borrowers.

## 8.5 Non-Banking Days

All payments due shall be made on a Banking Day. If the due date for payment falls on a day which is not a Banking Day:

8.5.1   the payment or payments due shall be made on the first Banking Day thereafter, provided this falls in the same calendar month; and

8.5.2   if it does not, payment shall fall due and be made on the immediately preceding Banking Day.

## 8.6 Accrual of interest and periodic payments

All payments of interest and other payments of an annual or periodic nature to be made by the Borrowers shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty (360) day year.

## 9. NO SET-OFF, COUNTERCLAIM OR TAX DEDUCTION

## 9.1 No set-off or counterclaim

All payments to be made by the Borrowers under this Agreement and any of the other Security Documents shall be made:

9.1.1   without set-off or counterclaim; and

9.1.2   free and clear of, and without deduction for or on account of, any present or future taxes, unless a Borrower is compelled by law to make payment subject to any such tax.

## 9.2 Gross up

If a Borrower is compelled by law to make payment subject to such taxes, that Borrower will:

9.2.1   promptly notify the Agent upon becoming aware of such requirement;

9.2.2   pay the Bank to which such payment is made such additional amounts as may be necessary to ensure that that Bank receives a net amount equal to the full amount which that Bank would have received had such payment not been subject to such taxes; and

9.2.3   deliver to the Agent copies of the receipts from the relevant government authority or body evidencing the due and punctual payment of such taxes.

9.3   This Clause 9.3 does not apply in respect of sums due from the Borrowers to the Swap Bank under or in connection with sums due under or in connection with the Master Agreement, to which the applicable provisions of the Master Agreement shall apply.

## 10.    ACCOUNTS OF THE BANKS

### 10.1    Lenders and Swap Bank to open accounts

Each Lender and the Swap Bank will open and maintain on its books accounts showing the amount owing to it from the Borrowers and the other Obligors and the amounts of all payments of principal, interest and other moneys falling due and received by that Lender and the Swap Bank.

### 10.2    Agent to open accounts

The Agent will open and maintain on its books accounts showing the amounts owing to each Bank from the Borrowers and the other Obligors and the amounts of all payments of principal, interest and other moneys falling due and received by that Bank.

### 10.3    Conclusiveness of entries

The Borrowers' obligation to repay the Loan or any part thereof, to pay interest thereon and to pay all other sums due under the Security Documents shall be conclusively evidenced (in the absence of manifest error) by the entries from time to time made in the accounts opened and maintained under this Clause 10.

## 11.    APPLICATION OF RECEIPTS

### 11.1    Order of application

Except as otherwise specifically provided in this Agreement or in any other of the Security Documents, all moneys received or recovered by any Bank under the Security Documents will, after discharging the cost (if any) incurred in collecting such moneys, be applied as follows:

FIRST:          in or towards payment of all moneys expended or liabilities incurred by the Banks (or any of them) in respect of expenses, fees or charges relating to the preparation, completion and registration of the Security Documents or in respect of the protection, maintenance or enforcement of the security they create;

SECONDLY:   in or towards the satisfaction of any amounts forming the balance of the Outstanding Indebtedness which are then due and payable, whether by reason of payment demanded or otherwise, in such order of application as the Agent may, with the Majority Lenders' authority, think fit;

THIRDLY:      at the Agent's discretion, in retention on suspense account of such amount as the Agent may consider appropriate to secure the discharge of any part of the Outstanding Indebtedness not then due and payable, and, upon the same becoming due and payable, in or towards the discharge thereof in accordance with the foregoing provisions of this Clause 11.1; and

FOURTHLY:   the balance (if any) shall be paid to the Borrowers or other person entitled.

### 11.2    Waiver of right of appropriation

Each Borrower hereby irrevocably waives any rights of appropriation to which it may be entitled.

## 12.   RETENTIONS

### 12.1   Borrowers to open Accounts

Each Borrower shall establish and maintain with the Agent an account, in its name, which shall be designated the "Porlock Maritime" Earnings Account and the "Tremain Shipping" Earnings Account (the "**Earnings Account**" together, the "**Earnings Accounts**").

### 12.2   Payment of Earnings

Each Borrower shall procure that throughout the Security Period, unless and until the Agent shall otherwise direct, all Earnings shall be paid and credited to its Earnings Account.

### 12.3   Application of Earnings

So long as no Event of Default or Potential Event of Default has occurred, any and all moneys credited to the Earnings Accounts will be applied by the Agent (which applications the Agent is hereby irrevocably and unconditionally authorised to make) as follows:

FIRST:    in payment of any amounts due and owing under or pursuant to the Security Documents, other than sums owing pursuant to Clauses 4 and 7;

SECONDLY:   by the Agent deducting the following amounts from the relevant Earnings Account:

(i)    at successive monthly intervals commencing three (3) months after the first Drawdown Date of each Advance of a Tranche one third of the amount of such Advance falling due for repayment to the Lenders under Clause 4 on the next succeeding Repayment Date; and

(ii)    at successive monthly intervals from the start of each Interest Period applicable to each Advance of a Tranche or any part thereof an amount equal to $1/x$ of the amount falling due to the Lenders by way of interest under Clause 7 on the next succeeding Interest Date (for which purpose $x$ shall be the number of months in that Interest Period, unless such Interest Period exceeds three (3) months, in which case $x$ shall be three (3)).

If the credit balance in the Earnings Accounts is insufficient for any such transfer to be made, the Borrowers will, on demand, remit to the Agent the sum necessary to rectify the insufficiency. If for any reason the Earnings of either Vessel are not being received on a monthly basis, the Agent is hereby authorised by the Borrowers, as and when the Earnings of that Vessel are received, to retain as much of those Earnings as the Agent considers necessary to ensure the discharge of amounts becoming due to it from the Borrowers pursuant to Clauses 4 and 7;

THIRDLY:    subject always to the Agent's rights under Clauses 12.5 and 12.11 the balance (if any) in the Earnings Accounts will be available to the Borrowers for payment and/or reimbursement of the Operating Expenses, provided always that payment and reimbursement of Operating Expenses shall be made only through the Agent and shall be conditional upon the Borrowers providing the Agent (if so requested by the Agent) with the relevant invoices, statements, vouchers, receipts and such other information or evidence as the Agent may require to substantiate to the Agent's satisfaction (a) that such payment and/or reimbursement is due, and (b) that the party to whom such moneys are to be

paid is the party properly entitled to receive such payment or reimbursement on account of the Operating Expenses concerned.

**12.4    Borrowers' obligations with respect to Earnings Accounts**

The Borrowers will, at the request of the Agent:

12.4.1    transfer or procure the transfer of any funds credited to the account specified in Clause 12.1 and pay or procure the payment of any Earnings, to such other account or accounts in substitution therefor with the Agent or any other bank or with any branch, sub-branch or subsidiary of the Agent or any other bank as the Agent may from time to time specify; and

12.4.2    forthwith upon demand do all such acts and things and execute such documents as the Agent may require in order to create security over the Earnings Accounts more effectively to secure the payment of the Outstanding Indebtedness.

The expressions **"Earnings Account"** and **"Earnings Accounts"** shall include any such account or accounts, whether designated as such or not, opened by the Borrowers or either of them at the request of the Agent with the Agent or any other bank or with any branch, sub-branch or subsidiary of the Agent or any other bank, as well as any sub-accounts to which funds in the said accounts may be allocated from time to time for currency or deposit purposes.

**12.5    Agent's right to withhold**

Notwithstanding anything to the contrary contained in this Agreement, so long as the Borrowers remain under any liability (whether actual or contingent) in respect of the Outstanding Indebtedness, the Agent shall be entitled to withhold payment (up to the amount of such actual or contingent liability) of any moneys from time to time standing to the credit of the Earnings Accounts and any other accounts for the time being of the Borrowers (or either of them) with the Agent and to refuse payment upon any negotiable instrument (up to the amount of such actual or contingent liability).

**12.6    Authorisation of applications**

The Agent is hereby irrevocably authorised by the Borrowers to apply on each Interest Date and Repayment Date any and all amounts on the Earnings Accounts in pro tanto satisfaction of the Borrowers' obligations to the Lenders in respect of the repayment of principal of and the payment of interest on the Loan or any part thereof.

**12.7    Appropriation after default**

On or at any time after the happening of an Event of Default or a Potential Event of Default:

12.7.1    the Borrowers shall not be entitled to make any further withdrawal from the Earnings Accounts; and

12.7.2    the Agent shall forthwith become entitled, with the Majority Lenders' authority, to direct that the Earnings be paid to such place and account as the Agent may think fit, and following such Event of Default or Potential Event of Default (without prejudice to the Banks' rights under Clause 19.2) at any time and without notice to the Borrowers to appropriate all or any of the moneys standing to the credit of the Earnings Accounts and any Earnings which may thereafter be received by the Agent and apply the same in or towards the discharge of the Outstanding Indebtedness in accordance with Clause 11.

## 12.8   Bank and other charges

All bank, exchange, telegraph and other charges in connection with the inward and outward remittance of moneys to and from the Earnings Accounts shall be for the account of the Borrowers, and the Agent shall be entitled and is hereby irrevocably and unconditionally authorised, to debit the amount of such charges to the account concerned, as and when such charges are incurred.

## 12.9   Continuing obligations of Borrowers

Nothing in this Clause 12, whether express or implied, shall relieve the Borrowers of their absolute and unconditional obligations to repay the Loan, to pay interest thereon and to pay all other sums from time to time due, owing or payable hereunder and under any of the other Security Documents.

## 12.10   Interest on moneys on the Earnings Accounts

Any amounts for the time being standing to the credit of the Earnings Accounts (if such Accounts are with the Agent) shall earn interest at the rate from time to time offered by the Agent to its customers for Dollar deposits of similar amounts and for periods similar to those for which such amounts are likely to remain standing to the credit of the Earnings Accounts.

## 12.11   Minimum balance

In relation to each Vessel subject to a Mortgage, the Borrowers shall ensure that there is always a minimum balance (the "**Minimum Balance**") in the relevant Earnings Account of $300,000 provided that the initial minimum balance on the purchase of a Vessel shall be $100,000 which amount the Borrower shall procure increases so that the Minimum Balance is achieved by the date falling six (6) calendar months after the relevant Drawdown Date. The Minimum Balance shall be retained by the Agent until the Outstanding Indebtedness has been repaid or prepaid in full.

## 13.   CONDITIONS PRECEDENT

## 13.1   Conditions to be satisfied

The Lenders will not be obliged to make their Commitments available and the Borrowers shall not be entitled to draw down the Loan unless the following conditions precedent are satisfied:

13.1.1  the Agent has received a duly completed Notice of Drawdown;

13.1.2  the Agent has received payment of the fees and expenses specified in Clause 20 to the extent due and payable;

13.1.3  the Agent or its legal advisers have received the documents and evidence described in Schedule 3, in form and substance satisfactory to them on or before the dates specified in Schedule 3; and

13.1.4  the Agent is satisfied that:

(a)     the representations and warranties contained in Clause 15 are true and correct at the Drawdown Date;

(b)     none of the circumstances specified in Clauses 21, 22 or 23 is subsisting; and

(c) no Event of Default or Potential Event of Default has occurred or will arise following the making available of such Advance.

**13.2 Waiver of conditions precedent**

If the Lenders in their absolute discretion make available an Advance notwithstanding that one or more of the conditions precedent specified above remains unsatisfied on the Drawdown Date, then the Borrowers shall procure the satisfaction of such condition or conditions precedent within fourteen (14) days thereafter or such longer period as the Agent may in its absolute discretion agree in writing.

**14. SECURITY**

**14.1 Borrowers to provide security**

As security for the payment of the Outstanding Indebtedness, the Borrowers shall execute, deliver to, and (where appropriate) register, and, as the case may be, procure that there is executed, delivered to and (where appropriate) registered, in favour of the Security Trustee as trustee for the Banks, in form and substance satisfactory to the Agent, the Security Documents set out in Clauses 14.2 and 14.3 on or before the relevant dates specified in those Clauses.

**14.2 Security to be provided before Notice of Drawdown**

The following Security Documents shall be executed, delivered and (where appropriate) registered on or before the date on which any Notice of Drawdown is given:

14.2.1 (if entered into) the Master Agreement;

14.2.2 (if entered into) the Master Agreement Security Deed;

14.2.3 the Account Security; and

14.2.4 the Corporate Guarantee.

**14.3 Security to be provided before applicable Drawdown Date**

In relation to each Vessel,, the following Security Documents shall be executed, delivered and (where appropriate) registered on or before the relevant Drawdown Date in relation thereto:

14.3.1 the Mortgage;

14.3.2 the General Assignment; and

14.3.3 the Approved Managers' Undertaking.

**15. REPRESENTATIONS AND WARRANTIES**

**15.1 Date of representations and warranties**

The Borrowers represent and warrant that the following matters are true at the date of this Agreement.

**15.2 Existence, powers and compliance**

Each Borrower:

15.2.1 is a company duly incorporated with limited liability, validly existing and in good standing under the laws of the country of its incorporation;

15.2.2  has full power to own its property and assets and to carry on its business as it is now being conducted; and

15.2.3  has complied with all statutory and other requirements relative to its business.

## 15.3   Capacity and authorisation

The entry into and performance by each Borrower of this Agreement and the other Security Documents and the Transaction Documents to which it is party are within the corporate powers of that Borrower and have been duly authorised by all necessary corporate actions and approvals. In entering into this Agreement and the other Security Documents each Borrower is acting on its own account and not as agent or nominee of any person.

## 15.4   No contravention of laws or contractual restrictions

The entry into and performance by each Borrower of this Agreement and the other Security Documents and the Transaction Documents to which it is party do not and will not:

15.4.1  contravene in any respect any law, regulation or contractual restriction which does, or may, bind that Borrower or any of its assets; or

15.4.2  result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any of its assets in favour of any party other than the Banks.

## 15.5   No third party Encumbrances

At the time of execution of this Agreement and each of the other Security Documents, no third party will have any Encumbrance (other than a Permitted Encumbrance) on any asset to which this Agreement or the relevant Security Document relates.

## 15.6   Licences and approvals in force

All licences, authorisations, approvals and consents necessary for the entry into, performance, validity, enforceability or admissibility in evidence of this Agreement, the other Security Documents and the Transaction Documents have been obtained and are in full force and effect, true copies have been delivered to the Agent and there has been no breach of any condition or restriction imposed in this respect.

## 15.7   Validity and enforceability

When duly executed and delivered, and where applicable registered, each of this Agreement and the other Security Documents will:

15.7.1  constitute the legal, valid and binding obligations of the parties thereto; and

15.7.2  will create a perfected security interest with the required priority in the assets and revenues intended to be covered thereby, enforceable against the parties thereto in accordance with their respective terms,

except insofar as enforcement may be limited by any applicable laws relating to bankruptcy, insolvency, administration and similar laws affecting creditors' rights generally.

## 15.8   Status of Transaction Documents

The copies of the Transaction Documents delivered to the Agent before the date of this Agreement are true and complete copies. The Transaction Documents constitute legal, valid, binding and enforceable obligations of the parties thereto in accordance with their respective

terms. No amendments or additions to the Transaction Documents have been agreed nor has any party thereto waived any of its respective rights under any of the Transaction Documents.

15.9 **No breach or default**

No Borrower is:

15.9.1 in breach of any law, governmental directive, guideline or policy statement, whether having the force of law or not; or

15.9.2 in default under any agreement to which it is party or by which it may be bound.

15.10 **No litigation current or pending**

No litigation, arbitration, tax claim or administrative proceeding is current or pending or (to the knowledge of either Borrower) threatened, which, if adversely determined, would have a materially detrimental effect on the financial condition of the Borrowers (or either of them).

15.11 **No default**

No continuing Event of Default or Potential Event of Default has occurred.

15.12 **Choice of law and jurisdiction**

The choice of English law to govern this Agreement and the other Security Documents except for the Mortgages and the submission by the Borrowers to the jurisdiction of the English courts is valid and binding, and no Borrower is entitled to claim any immunity in relation to itself or its assets under any law or in any jurisdiction in connection with any legal proceedings, set-off or counterclaim relating to this Agreement or the other Security Documents or in connection with the enforcement of any judgement or order arising from such proceedings.

15.13 **Truth of financial and other information**

The financial and other information supplied to any Bank by or on behalf of either Borrower or any other Obligor in connection with the negotiation and the preparation of this Agreement or delivered to any Bank pursuant to this Agreement is true and accurate in all material respects when given, and does not contain any misstatement of fact or omit any material fact.

15.14 **No deterioration of financial condition**

No Borrower's financial condition has suffered any material deterioration since that condition was last disclosed to the Agent.

15.15 **No liability to deduction or withholding**

All payments to be made by either Borrower under this Agreement and the other Security Documents may be made free and clear of and without deduction or withholding for or on account of any taxes, and neither this Agreement nor any of the other Security Documents is liable to any registration charge or any stamp, documentary or similar taxes imposed by any authority, including without limitation, in connection with the admissibility in evidence of any thereof.

**15.16  No established place of business in United Kingdom**

No Borrower has an established place of business in any part of the United Kingdom or the United States of America or in any other jurisdiction which would require any of the Security Documents to be filed or registered in that jurisdiction to ensure its validity or enforceability.

**15.17  Pari passu obligations**

Each Borrower's obligations under this Agreement and the other Security Documents will rank at least pari passu with all of its other unsecured and unsubordinated obligations and liabilities from time to time outstanding other than as preferred by statute.

**15.18  No bank account with other banks**

The Borrowers do not have a bank account with any other bank, financial institution or similar entity other than the Agent except pursuant to either MOA.

**15.19  No commissions or rebates**

There are no commissions, rebates, premiums or other payments by or to or for the account of any Obligor, its shareholders or directors in connection with the transactions contemplated by this Agreement, other than as disclosed to the Agent in writing.

**15.20  Environmental matters**

Except as may have been disclosed by the Borrowers in writing to, and acknowledged in writing by, the Agent:

15.20.1 the Borrowers and other Obligors and, to the best of each Borrower's knowledge and belief (having made due enquiry), their respective Environmental Affiliates have complied with the provisions of all Environmental Laws;

15.20.2 the Borrowers and the other Obligors and, to the best of each Borrower's knowledge and belief (having made due enquiry), their respective Environmental Affiliates have obtained all Environmental Approvals and are in compliance with all such Environmental Approvals;

15.20.3 neither the Borrowers nor any other Obligor nor, to the best of each Borrower's knowledge and belief (having made due enquiry), any of their respective Environmental Affiliates has received notice of any Environmental Claim that alleges that any of the Borrowers or any other Obligor or any such Environmental Affiliate is not in compliance with any Environmental Law or any Environmental Approval;

15.20.4 there is no Environmental Claim pending or, to the best of each Borrower's knowledge and belief (having made due enquiry), threatened against any of the Borrowers or any other Obligor or any Relevant Ship or, to the best of each Borrower's knowledge and belief (having made due enquiry), any of their respective Environmental Affiliates; and

15.20.5 no Environmental Incident which could or might give rise to any Environmental Claim has occurred.

**15.21  Status of Vessels**

On each relevant Drawdown Date, a Vessel will be:

15.21.1 in the absolute ownership of the relevant Borrower as the sole, legal and beneficial owner of that Vessel free from all Encumbrances save for any Encumbrance created by or pursuant to the Security Documents;

15.21.2 duly registered under the Liberian flag in the sole ownership of the relevant Borrower;

15.21.3 in compliance with all applicable laws, regulations and requirements (statutory or otherwise) applicable to ships registered under the Liberian flag and engaged in the service in which that Vessel is or is to be engaged;

15.21.4 operationally seaworthy and in every way fit for service;

15.21.5 classed with the Classification Society and Classification specified in Schedule 5 free from all recommendations, notations and average damage;

15.21.6 delivered to and accepted by an Approved Charterer on the terms of the relevant Initial Charter;

15.21.7 managed by the Approved Manager on the terms of the Approved Management Agreement; and

15.21.8 insured in accordance with the provisions of the relevant Security Documents, and all requirements relating to the Insurances and the noting of the Security Trustee's interest thereon will have been satisfied.

**15.22    Continuing nature of representations and warranties**

The Borrowers agree that the representations set out in this Clause 15 shall survive the execution of this Agreement and shall be deemed to be repeated on each Drawdown Date and on each Interest Date with reference to the facts and circumstances then subsisting, as if made on such date.

**16.    UNDERTAKINGS OF THE BORROWERS**

**16.1    Duration of undertakings**

Each Borrower shall comply with the undertakings contained in this Clause 16 which shall remain in force from the date of this Agreement to the end of the Security Period.

**16.2    General Undertakings**

Each Borrower shall:

16.2.1 perform and observe the several covenants and obligations imposed upon it under the Security Documents;

16.2.2 without affecting its obligations under the applicable provisions of the Security Documents, perform and observe its obligations under the Transaction Documents to which it is a party, and use its best endeavours to procure that each of the other parties to the Transaction Documents performs and observes its obligations thereunder;

16.2.3 ensure that the Earnings of its Vessel are paid, and that the persons from whom the Earnings are from time to time due are instructed to pay them, to the Earnings Accounts, unless and until the Agent shall otherwise direct;

16.2.4 inform the Agent promptly of any litigation, arbitration, tax claim or administrative proceeding instituted or (to its knowledge) threatened and of any other occurrence of which it becomes aware which might materially adversely affect:

(a) its ability, or the ability of any other Obligor, to perform its obligations under the Security Documents; or

(b) the security constituted by the Security Documents;

16.2.5 maintain its corporate existence as a corporation duly organised, validly existing and in good standing in its place of incorporation;

16.2.6 obtain and maintain in force, and promptly furnish certified copies to the Agent of, all licences, authorisations, approvals and consents, and do all other acts and things, which may from time to time be necessary or desirable for the continued due performance of its obligations under the Security Documents or which may be required for the validity, enforceability or admissibility in evidence of the Security Documents and the Transaction Documents to which it is a party;

16.2.7 ensure that its obligations under the Security Documents rank at least pari passu with all its other present, future and/or contingent unsecured and unsubordinated obligations;

16.2.8 conduct its business in a proper and efficient manner and not change the nature, organisation or conduct of its business or conduct any business other than that of ownership of its Vessel;

16.2.9 promptly after the happening of any Event of Default or a Potential Event of Default, notify the Agent of such event and of the steps (if any) which are being taken to remedy it;

16.2.10 pay all taxes, assessments and other governmental charges as they fall due, except to the extent that it is contesting the same in good faith by appropriate proceedings and has set aside adequate reserves for their payment if such proceedings fail;

16.2.11 keep proper books of account in respect of its business in accordance with generally accepted accounting principles consistently applied and whenever so requested by the Agent make the same available for inspection by or on behalf of the Agent and any Lender;

16.2.12 provide the Agent:

(a) within 30 June of each financial year with certified copies (in sufficient number for each of the Lenders) of its profit and loss account and balance sheet prepared in a form consistent with generally accepted accounting principles and practices consistently applied and audited by auditors previously approved in writing by the Agent; and

(b) within three (3) months after the date thereof with certified copies of all its management accounts, interim accounts and financial statements which should in the normal course be made available to its shareholders and which shall be produced at least every six (6) months during each financial year;

16.2.13 procure that the Corporate Guarantor provides the Agent within 30 June of each financial year with certified copies (in sufficient number for each of the Lenders) of the consolidated profit and loss account and balance sheet of the Corporate Guarantor

and its subsidiaries, prepared in a form consistent with generally accepted accounting principles and practices consistently applied and audited by auditors previously approved in writing by the Agent;

16.2.14 provide the Agent with such other financial and other information concerning itself and its affairs and its Vessel as the Agent may from time to time require, including (but without limitation) full information regarding the employment, condition, geographical position, crewing, Operating Expenses and engagements of its Vessel and particulars of all contracts concerning its Vessel;

16.2.15 provide the Agent with any information requested by it pursuant to any anti-money laundering legislation, regulation or procedures applicable to the Banks (or any of them) from time to time, so as to ensure compliance by all the Banks;

16.2.16 (if the Agent, acting reasonably and following consultation with the Borrowers, considers that its financial position or prospects are deteriorating), give independent auditors appointed to carry out an audit and inspection of its affairs every assistance in that regard;

16.2.17 promptly, at the request of the Agent from time to time, provide the Agent with a certificate signed by its chief financial officer or chief executive officer confirming that it is, as at the date of such certificate, in compliance with its obligations under the Security Documents and that no Event of Default or Potential Event of Default has occurred, or, if any has occurred, none is continuing;

16.2.18 procure that its Vessel is managed only by the Approved Manager on the terms of the Approved Management Agreement and not without the prior written consent of the Agent to terminate such appointment or to appoint any other managers of its Vessel;

16.2.19 maintain at all times organisation and personnel which are in the opinion of the Agent adequate to provide sufficient management, agency, financial, secretarial and other services for its Vessel;

16.2.20 if its Vessel time chartered for a period which exceeds, or which by virtue of any optional extensions might exceed, six (6) months' duration, execute a specific assignment in favour of the Security Trustee of all its rights, title and interest in and to each and any such time charter, in such form as the Agent shall, with the Majority Lenders' authority, approve or require, and do all such acts and things as the Agent may, with the Majority Lenders' authority, require to perfect the security constituted by such assignment; and

16.2.21 comply, and procure compliance by the Approved Manager of its Vessel, with:

    (a)    all provisions of The International Management Code for the Safe Operation of Ships and for Pollution Prevention (as adopted by the International Maritime Organisation as Resolutions A.741(18) and A.788(19) (as amended, supplemented or replaced from time to time, the "ISM Code")) including, without limitation, obtaining and maintaining in force at all times a valid Document of Compliance in relation to itself and a valid Safety Management Certificate in respect of the Vessel as required by the ISM Code; and

    (b)    all provisions of The International Ship and Port Facility Security Code (as adopted by the International Maritime Organization (as amended, supplemented or replaced from time to time, the "ISPS Code")), including, without limitation, obtaining and maintaining in force a valid International Ship Security Certificate in respect of its Vessel as required by the ISPS

Code, and ensuring that that Vessel's security system and its associated security equipment comply with the applicable requirements of Part A of the ISPS Code and of Chapter XI-2 of the Safety of Life at Sea Convention (SOLAS), and that an approved ship security plan is in place.

## 16.3   Consent of Agent required

No Borrower shall without the prior consent of the Agent, with the Majority Lenders' authority:

16.3.1   except as contemplated by this Agreement, convey, assign, transfer, sell or otherwise dispose of or deal with any of its real or personal property, assets or rights, whether present or future;

16.3.2   create or permit to exist any Encumbrance (other than a Permitted Encumbrance) over any part of its undertaking, property, assets or rights, whether present or future (provided that where any such Encumbrance arises in the ordinary course of business, that Borrower shall promptly discharge the same);

16.3.3   incur any Financial Indebtedness or other liability or obligation except:

(a)   under this Agreement and the other Security Documents;

(b)   to any other Obligor, provided that, before such Financial Indebtedness is incurred, particulars of the same are immediately notified to the Agent, and the relevant Obligor(s) execute(s) such deeds and documents as the Agent may at its discretion require to subordinate the same to the Outstanding Indebtedness;

(c)   arising under the Transaction Documents to which it is a party; or

(d)   arising in the ordinary course of operating and chartering the Vessel belonging to it;

16.3.4   waive or fail to enforce any provision of, or agree to any amendment or supplement to, the Transaction Documents to which it is a party;

16.3.5   issue any further shares or stock or register any transfer of any of its shares or stock, or admit any new member, whether by subscription or transfer;

16.3.6   consolidate, amalgamate or merge with any other entity;

16.3.7   form or acquire any subsidiary;

16.3.8   alter or extend its financial year for the purposes of the preparation of its accounts, or change its auditors;

16.3.9   alter any of the provisions of its constitutional documents;

16.3.10  make any loans or advances to, or any investments in, any person (including, without limitation, any officer, director, stockholder, employee or customer of either Borrower);

16.3.11  except as contemplated by this Agreement, assume, guarantee or endorse, or otherwise become or remain liable for, any obligation of any other person;

16.3.12 authorise or accept any capital commitment other than in the normal course of business;

16.3.13 pay any divided or make any payment of principal or interest to any of its shareholders in respect of any loans or loan capital made available to it by its shareholders;

16.3.14 consolidate or subdivide or alter any of the rights attached to, or reduce, any of its share capital, or capitalise, repay or otherwise distribute any amount outstanding to the credit of any capital or revenue reserves, redeem any of its share capital in any way or enter into any arrangement with its creditors; or

16.3.15 permit any changes to be made in the identity of its directors, officers or senior management personnel.

## 17.  REVIEW OF INSURANCES

### 17.1  Consultation of insurance advisers

The Security Trustee shall be entitled, at any time and from time to time, to consult insurance advisers on any matter relating to the Insurances (including, without limitation, the terms, amounts and quality of the Insurances and the status of any insurance claims), and the Borrowers shall procure that there is delivered to such advisers any and all such information concerning the Vessels and their Insurances as the Security Trustee may require.  The costs and expenses of any such insurance advisers shall be for the account of the Borrowers and be payable on demand.

### 17.2  Modification of Insurances

If, in the opinion of the Security Trustee, by reason of a significant change in circumstances after the date of this Agreement (such changes in circumstances to include, without limitation, changes in the availability or cost of insurance coverage or in generally accepted industry practice) the Insurances do not provide the Lenders with good and adequate security, the Security Trustee may from time to time notify the Borrowers of any proposed modification of the requirements of the Security Documents relating to Insurances which the Security Trustee may consider appropriate in the circumstances.  Such modification may (without limitation) require the Borrowers to place, or procure the placing of, further and additional insurances and/or to amend or procure the amendment of the existing Insurances, whether through the existing brokers or otherwise.  Any such modification shall take effect as an amendment to the Security Documents on and from the date on which it is notified in writing to the Borrowers and shall bind the Borrowers accordingly.

## 18.  VALUATIONS AND ASSET PROTECTION

### 18.1  Arrangement of valuations

The Agent may at any time and from time to time arrange for valuations of the Vessels or any of them to be carried out in order to determine the Appraised Market Value of the Vessels or that Vessel in accordance with the following provisions of this Clause 18.

### 18.2  Basis of valuations

Such valuations shall be prepared:

18.2.1  with or without a physical inspection of the Vessel concerned, at the discretion of the Agent;

18.2.2  in Dollars on the basis of a sale for prompt delivery, charter-free, at arm's length between a willing seller and a willing buyer;

18.2.3  by two independent first-class international sale and purchase shipbrokers or valuers one of whom shall be nominated by the Borrowers and approved by the Agent and the other shall be nominated by the Agent, provided however that if the valuations of the two shipbrokers or valuers so appointed differ by a margin of ten per cent. (10%) or more the Borrowers or the Agent may instruct such shipbrokers or valuers jointly to appoint and employ a third independent first-class international sale and purchase shipbroker or valuer to provide a third valuation;  and

18.2.4  at the cost of the Borrowers provided that, if there is no continuing Event of Default, the Borrower shall be obliged to pay for one valuation only per Vessel each year.

18.3    **Appraised Market Value**

The Appraised Market Value of a Vessel shall be determined by taking the mean average of the valuations of that Vessel.

18.4    **Consequences of security shortfall**

If the aggregate of (i) the Appraised Market Value of the Vessels and (ii) the market value, as determined by the Agent, of any additional security previously provided under this Clause 18 is at any time less than one hundred and twenty per cent (120%) of the Loan, then the Borrowers shall, within thirty (30) days of a demand by the Agent to that effect either:

18.4.1  provide additional security over such assets and in such form as is acceptable to the Majority Lenders which have a market value as determined by the Majority Lenders at least equal to the shortfall; or

18.4.2  prepay such part of the Loan as will eliminate the shortfall in accordance with the relevant provisions of Clause 5.4.

18.5    **Valuation of additional security**

The market value of any additional security provided or to be provided under this Clause 18 shall be determined by valuers appointed by, and on a basis acceptable to, the Agent.

18.6    **Valuation conclusive**

Any valuation prepared under this Clause 18 shall be conclusive and binding on the Borrowers.

18.7    **Costs of valuation**

The Borrowers shall pay the costs, fees and expenses of any shipbroker or valuer in connection with any valuation prepared under this Clause 18 provided that, if there is no continuing Event of Default, the Borrower shall be obliged to pay for one valuation only per Vessel each year.

18.8    **Assistance**

The Borrowers shall provide such assistance as the Agent shall require in connection with any valuation prepared under this Clause 18.

## 19.  EVENTS OF DEFAULT

### 19.1  Defaults

There shall be an Event of Default if any one or more of the following happen:

19.1.1  a Borrower fails to make any payment due under any of the Security Documents on its due date, or, in respect of moneys payable on demand, (unless otherwise specifically provided) within five (5) days from the date of such demand;

19.1.2  a Borrower is in breach of any of the provisions of Clauses 12.11, 16.2.5, 16.3 or 18.4 or any one or more of the provisions of the Security Documents relating to the Insurances;

19.1.3  a Borrower fails to observe or perform any provision of the Security Documents other than those referred to in Clauses 19.1.1 and 19.1.2 and either, in the opinion of the Majority Lenders, such default is not remediable, or, in the case of any such default which the Majority Lenders consider capable of remedy, such default continues for a period of seven (7) days after the Agent, by notice to the Borrowers, requires the same to be remedied;

19.1.4  any licence, approval, consent, authorisation or registration at any time necessary or desirable for the validity, enforceability or admissibility in evidence of the Security Documents, or for a Borrower to comply with its obligations thereunder, or in connection with the ownership or operation of a Vessel, is revoked, withheld or expires, or is modified in what the Majority Lenders consider a material respect;

19.1.5  a Vessel becomes a Total Loss and (without prejudice to the Borrowers' obligations under Clause 5.3) the Agent does not receive, within one hundred and twenty (120) days following the Total Loss Date, the insurance proceeds relating to the Total Loss in an amount not less than the amount for which that Vessel is required to be insured under the Security Documents as at the Total Loss Date or, if lower, the amount of the Outstanding Indebtedness at the date of receipt by the Agent;

19.1.6  a petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of a Borrower (other than for the purposes of amalgamation or reconstruction in respect of which the prior written consent of the Agent, such consent not to be unreasonably withheld, with the Majority Lenders' authority, has been obtained) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to a Borrower or if a Borrower suspends payment of, or is unable to or admits inability to pay, its debts as they fall due or makes any special arrangement or composition with creditors generally or any class of its creditors;

19.1.7  an administrator, administrative receiver, receiver or trustee or similar official is appointed of the whole, or what the Majority Lenders consider a material part, of the property, assets or undertaking of a Borrower or if a Borrower applies for, or consents to, any such appointment;

19.1.8  any step is taken (including, without limitation, the making of any application or the giving of any notice) by a Borrower or by any other person to appoint an administrator in respect of a Borrower;

19.1.9  an encumbrancer takes possession of, or distress or execution is levied upon, the whole, or what the Majority Lenders consider a material part, of the property, assets or undertaking of a Borrower;

19.1.10 a Borrower ceases, or threatens to cease, to carry on its business, or disposes or threatens to dispose of what the Majority Lenders consider a material part of its properties, assets or undertakings, or such a part is seized or nationalised, appropriated or compulsorily purchased by or under the authority of any government;

19.1.11 anything is done, suffered or omitted to be done or occurs which, in the opinion of the Majority Lenders would in any way imperil the security created by the Security Documents;

19.1.12 an event of default or event of termination occurs in relation to any obligation whatsoever of a Borrower in respect of Financial Indebtedness, whether such obligation is to the Lenders or any other person or any guarantee or indemnity given by a Borrower is not honoured when called;

19.1.13 any representation or warranty made or deemed to be made in any of the Security Documents or Transaction Documents, or in any certificate or statement delivered in connection with any of the Security Documents or Transaction Documents or in the negotiations leading up to the conclusion of this Agreement is, or at any time becomes, incorrect in any respect which the Majority Lenders consider materially adverse to the Lenders, as if such representation or warranty were made as of such time;

19.1.14 a Borrower ceases to be a company duly registered in good standing in the place in which it was incorporated;

19.1.15 it becomes impossible or unlawful for a Borrower to fulfil any of its obligations under the Security Documents, or for the Banks (or any of them) to exercise any of the rights vested in them by, or to enforce the security constituted by, the Security Documents, or any of the Security Documents for any reason becomes invalid or unenforceable or ceases to be in full force and effect or either Borrower repudiates or threatens to repudiate any of the Security Documents;

19.1.16 without the prior written consent of the Agent, with the Majority Lenders' authority, there is any change in the legal or beneficial ownership of the shares/stock of a Borrower;

19.1.17 in the opinion of the Majority Lenders there is any material adverse change in the financial condition or prospects of a Borrower;

19.1.18 any of the events specified in Clauses 19.1.1 to 19.1.17 inclusive occurs (mutatis mutandis) in relation to any other Obligor;

19.1.19 any event occurs or proceeding is taken in relation to a Borrower or any other Obligor in any jurisdiction which has an effect equivalent or similar to any of the events specified in Clauses 19.1.6 to 19.1.8 inclusive;

19.1.20 the registration of a Vessel under the laws and flag of its flag state is cancelled or terminated without the prior written consent of the Agent, with the Majority Lenders' authority;

19.1.21 any licence, approval, consent, authorisation or registration at any time necessary or desirable for the validity, enforceability or admissibility in evidence of any of the other Transaction Documents, or for any of the parties thereto to comply with its obligations thereunder, is revoked, withheld or expires, or is modified in what the Agent considers a material respect;

19.1.22 it becomes impossible or unlawful for any party to any of the Transaction Documents to fulfil any of its obligations under, or to exercise any rights vested in it by any of the Transaction Documents or any of the Transaction Documents is breached in any material respect by any party thereto or is terminated or for any reason becomes invalid or unenforceable or otherwise ceases to be in full force and effect or any party thereto repudiates or threatens to repudiate any of the Transaction Documents;

19.1.23 any event of default (as so described in any other of the Security Documents) occurs; or

19.1.24 a Borrower, any other Obligor and/or any Environmental Affiliate fails to comply with any Environmental Law or any Environmental Approval or a Vessel or any other Relevant Ship is involved in any incident which gives rise or may give rise to an Environmental Claim if, in any such case, such non-compliance or incident or the consequences thereof would, in the opinion of the Agent, have a material adverse effect on the business, assets, operations, property or financial condition of a Borrower or any other Obligor or on the security constituted by any of the Security Documents.

## 19.2 Lenders' remedies

Upon the occurrence of an Event of Default and at any time thereafter without prejudice to any of the rights and remedies of the Agent and/or the Security Trustee and/or any Lender under any of the other Security Documents or otherwise:

19.2.1 the Agent may, and shall if so requested by the Majority Lenders, take any one or more of the following actions:

(a) by written notice to the Borrowers declare the Commitments of the Lenders cancelled, whereupon the same shall be cancelled;

(b) by written notice to the Borrowers demand the immediate repayment of the Loan, all interest accrued thereon and all other Outstanding Indebtedness, whereupon the same shall become immediately due and payable; and

(c) take steps to exercise the rights and remedies conferred upon the Agent and/or the Lenders by this Agreement and the other Security Documents and exercisable on or after the occurrence of an Event of Default; and

19.2.2 the Security Trustee may, and shall if so requested by the Majority Lenders, take steps to enforce the security created by the Security Documents and/or otherwise exercise the rights and remedies conferred on the Security Trustee by this Agreement and the other Security Documents and exercisable on or after the occurrence of an Event of Default.

## 20. FEES, EXPENSES AND INDEMNITIES

## 20.1 Fees

The Borrowers shall pay to the Agent on the date of this Agreement (to the extent not paid by the Borrowers before the date of this Agreement), for distribution among the Banks as agreed between the Agent and the Banks, an arrangement fee of $660,000.

20.2   **Indemnity against costs**

The Borrowers shall pay to the Agent on demand, and each Borrower shall indemnify and keep each Bank indemnified against, all costs, charges, expenses, claims, liabilities, losses, duties and fees (including, but not limited to, legal fees and expenses on a full indemnity basis) and taxes thereon suffered or incurred by that Bank:

20.2.1   in the negotiation, preparation, printing, execution and registration of this Agreement and the other Security Documents;

20.2.2   in the enforcement or preservation or the attempted enforcement or preservation of any of the rights and powers of the Banks (or any of them) under this Agreement and the other Security Documents or of the security constituted by the Security Documents;

20.2.3   in connection with any actual or proposed amendment of or supplement to this Agreement or any other of the Security Documents, or with any request of the Banks (or any of them) to grant any consent or waiver in respect of any provision of this Agreement or any other of the Security Documents, whether or not the same is given;

20.2.4   arising out of any act or omission made by the Banks (or any of them) in good faith in connection with any of the matters dealt with in the Security Documents; and

20.2.5   in the case of a Lender, resulting from the imposition from time to time, under or pursuant to the Bank of England Act 1988 and/or by the Bank of England and/or by the Financial Services Authority (or other United Kingdom governmental authorities or agencies) of a requirement upon that Lender to pay fees to the Financial Services Authority calculated by reference to liabilities used to fund its Contribution.

20.3   **Stamp duties**

The Borrowers shall pay any and all stamp, documentary, registration and like taxes or charges imposed by governmental authorities in relation to this Agreement and the other Security Documents, and each Borrower shall indemnify each Bank against any and all liabilities with respect to, or resulting from, delay or omission on the part of the Borrowers to pay such taxes or charges.

20.4   **General indemnities**

The Borrowers shall pay to the Agent on demand, and each Borrower shall indemnify each Bank, against any losses, expenses or liabilities whether actual or contingent, (as to the amount of which the Agent's certificate shall be conclusive and binding upon the Borrowers, except in case of manifest error) suffered or incurred by that Bank in connection with or as a result of:

20.4.1   an Advance not being drawn in full on the relevant Drawdown Date specified in the Borrowers' Notice of Drawdown for any reason, other than as a result of a default by that Bank;

20.4.2   any repayment or prepayment of the whole or any part of the Loan being made on any date other than the last day of the Interest Period applicable thereto;

20.4.3   any default in payment by the Borrowers (or either of them) of any sum due under the Security Documents on its due date; or

20.4.4   the occurrence or continuance of an Event of Default and/or a Potential Event of Default.

## 20.5   Breakage costs

Without prejudice to its generality, Clause 20.4 shall extend to:

20.5.1   any interest, fees or other sums whatsoever paid or payable on account of any funds borrowed by any Bank in order to fund any unpaid amount; and

20.5.2   to any loss (including loss of profit), premium, penalty or expense which may be incurred by any Bank in liquidating or employing deposits from third parties taken to make, maintain or fund the Loan (or any part thereof) or any other amount due or to become due to any Bank under the terms of any of the Security Documents.

## 20.6   Agent's management time

Any amount payable to the Agent by the Borrowers under Clauses 20.2.2, 20.2.3, 20.2.4 and Clause 20.4 shall include the cost of utilising the Agent's management time or other resources, which cost will be calculated on the basis of such reasonable daily or hourly rates as the Agent may notify to the Borrowers, and is in addition to any fee paid or payable to the Agent under Clause 20.1.

## 20.7   Currency indemnity

The following shall apply if any amount is received or recovered by any Bank in respect of any moneys or liabilities due, owing or incurred by the Borrowers (or either of them) to that Bank (whether as a result of any judgment or order of any court or in the bankruptcy, administration, reorganisation, liquidation or dissolution of a Borrower or by way of damages for any breach of any obligation to make any payment to a Bank) in a currency (the "Currency of Payment") other than Dollars in whatever circumstances and for whatever reason:

20.7.1   such receipt or recovery shall only constitute a discharge to the Borrowers to the extent of the amount in Dollars which that Bank is able or would have been able, on the date or dates of receipt by it of such payment or payments in the Currency of Payment (or, in the case of any such date which is not a Banking Day, on the next succeeding Banking Day), to purchase in the foreign exchange market of its choice with the amount or amounts so received;

20.7.2   if the amount of Dollars which that Bank is so able to purchase falls short of the amount originally due to that Bank, each Borrower shall indemnify and hold that Bank harmless against any loss or damage arising as a result by paying to the Agent that amount in Dollars certified by the Agent as necessary to so indemnify and hold harmless that Bank;

20.7.3   this indemnity shall constitute a separate and independent obligation from the other obligations contained in this Agreement, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Bank from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum or sums in respect of amounts due hereunder or under any such judgment or order; and

20.7.4   the certificate of the Agent as to the amount of any such loss or damage (which shall be deemed to constitute a loss suffered by that Bank shall (save in case of manifest error) for all purposes be conclusive and binding on the Borrowers.

20.8 **Environmental indemnity**

Without prejudice to or limitation of any other rights or remedies that may at any time be available to or exercisable by the Agent or any of the other Banks, the Borrowers shall indemnify and hold harmless the Agent and each of the other Banks on demand against all costs, expenses, liabilities, losses, damages, and injury, personal or economic, sustained or incurred by any of them or their property (real or personal) for any reason as a result of or in connection with any release or the emission, presence, discharge of Material of Environmental Concern on, from, affecting or caused by a Vessel or any other Relevant Ship under any applicable Environmental Laws including, but not limited to, costs and expenses incurred to clean up or remove discharged oil or other Material of Environmental Concern, damages to third parties, natural resource damage, assessments or penalties, and whether sustained or incurred during or after the Security Period.

20.9 **Survival of indemnities**

The indemnities contained in the Security Documents shall continue in full force and effect after the full and final discharge of the Outstanding Indebtedness with respect to matters arising prior to such discharge.

21. **CHANGES IN CIRCUMSTANCES**

21.1 **Market disturbances**

This Clause 21 applies if at any time prior to the commencement of any Interest Period:

21.1.1 the Agent (after consultation with the Lenders) shall determine that, by reason of circumstances affecting the London Interbank Market generally, adequate and reasonable means do not or will not exist for ascertaining the Interest Rate applicable to that Interest Period;

21.1.2 the Lenders shall determine and notify the Agent that the rate at which deposits in Dollars are being offered to the Lenders in the London Interbank Market would not adequately reflect the cost to the Lenders of making, funding or maintaining their respective Commitments or Contributions or any part thereof for the duration of that Interest Period;

21.1.3 the Agent shall determine that none of the Lenders is or will be able to furnish the Agent with quotations pursuant to Clause 7.5 to enable the Agent to fix the Interest Rate applicable to that Interest Period; or

21.1.4 any Lender (the **"Affected Lender"**) shall determine and certify to the Agent that, by reason of circumstances affecting the London Interbank Market generally, deposits in Dollars are not available to it in sufficient amounts in the ordinary course of business and that accordingly the Affected Lender will not be able to make, fund or maintain its Commitment or Contribution or any part of it during that Interest Period.

21.2 **Determination Notice**

If any of the circumstances described in Clause 21.1 occurs, the Agent shall promptly give notice thereof (a **"Determination Notice"**) to the other Banks and the Borrowers.

21.3 **Suspension of Lenders' Commitments**

If a Determination Notice is given prior to the Loan or any part thereof being advanced by the Lenders, then the Lenders' obligations to make available their respective Commitments in the

Loan or any part thereof or the Affected Lender's obligation to make available its Commitment in the Loan or any part thereof (as the case may be) shall be suspended during the continuation of such circumstances.

## 21.4   **Mitigation**

If the Determination Notice is given after the Loan or any part thereof being advanced by the Lenders, the Borrowers, the Agent and the Lenders or the Affected Lender (as the case may be) shall negotiate in good faith in order to agree a mutually satisfactory Interest Rate or Rates, Interest Period or Periods and Interest Date or Dates or basis of funding for the Lenders or the Affected Lender (as the case may be) to be substituted for those which would otherwise have applied under this Agreement.

## 21.5   **Alternative funding**

If the Borrowers, the Agent and the Lenders or the Affected Lender (as the case may be) are unable to agree an Interest Rate or Rates, Interest Period or Periods and Interest Date or Dates or basis of funding for the Lenders or the Affected Lender (as the case may be) within a period not exceeding thirty (30) days of the giving of such Determination Notice, the Agent shall set an Interest Rate or Rates, an Interest Period or Periods and Interest Date or Dates or basis of funding for the Lenders or the Affected Lender (as the case may be) all to take effect from the expiration of the Interest Period current at the date of the Determination Notice, which Interest Rate or Rates shall be the aggregate of the Applicable Margin and the cost to the Lenders or the Affected Lender (as the case may be) of funding its Commitment or Contribution or relevant part thereof (as the case may be) in any available currency for the Interest Period or Periods so set.

## 21.6   **Repeat of procedure**

If the state of affairs referred to in the Determination Notice extends beyond the end of an Interest Period so agreed or set, the foregoing procedure shall be repeated as often as may be necessary.

## 21.7   **Borrowers' right of prepayment**

The Borrowers may give seven (7) Banking Days notice to the Agent that they wish to prepay the Loan or the Affected Lender's Contribution (as the case may be) as a result of an interest rate set pursuant to Clause 21.5.  The relevant provisions of Clause 5.4 shall apply to that prepayment.

## 22.   **INCREASED COST**

## 22.1   **Causes of increased cost**

This Clause 22 applies if a Lender (the "**Affected Lender**") considers that as a result of (a) the introduction of or any change in any applicable law, regulation or official directive (whether or not having the force of law), or in the interpretation thereof by any authority charged with the administration thereof or by any court of competent jurisdiction, or (b) compliance by the Affected Lender with any directive, request or requirement from any applicable governmental, fiscal or monetary authority (whether or not having the force of law):

22.1.1   there is any change in the basis of taxation (other than the basis of taxation of the Affected Lender's overall net income) of payments by either Borrower to the Affected Lender of principal, interest or otherwise;

22.1.2   there is any change in the basis of taxation of payments by the Affected Lender of principal or interest on, or otherwise in respect of, deposits taken from third parties to make, fund or maintain its Commitment or Contribution;

22.1.3   any reserve, special deposit, cash ratio, liquidity or other requirements are imposed, modified or deemed applicable against assets held by or deposits in or for the account of, or loans by, the Affected Lender (including, without limitation, any such requirements arising out of the implementation of any regulations which may replace those set out in the statement of the Basle Committee on Banking Regulations and Supervisory Practices dated July 1988 and entitled "International Convergence of Capital Measurement and Capital Structures"); or

22.1.4   any other condition is imposed on the Affected Lender in respect of the transactions contemplated by this Agreement or any other of the Security Documents,

and, as a result, the Affected Lender incurs an increased cost.

22.2   **Types of increased cost**

An increased cost is:

22.2.1   any additional cost to the Affected Lender of making, funding or maintaining its Commitment or Contribution or any part thereof or entering into this Agreement;

22.2.2   any reduction in any amount payable or the effective return to the Affected Lender under this Agreement; or

22.2.3   the amount of any payment made by the Affected Lender or the amount of any interest or other return foregone by the Affected Lender calculated  by reference to any amount received or receivable by the Affected Lender from any other person who is a party to this Agreement or any Security Documents.

22.3   **Notification by Affected Lender**

An Affected Lender shall notify the Agent as soon as practicable of any increased cost incurred by it.

22.4   **Notification by Agent**

The Agent shall promptly notify the other Banks and the Borrowers of any notice which it receives from the Affected Lender under this Clause 22.

22.5   **Indemnification of Affected Lender**

The Borrowers shall pay to the Agent for the account of the Affected Lender from time to time upon demand such additional moneys as the Agent shall specify to be necessary to indemnify the Affected Lender for any increased cost.

22.6   **No defence**

It shall not be a defence to a claim by the Affected Lender under this Clause 22 that any increased cost could have been avoided by the Affected Lender.

22.7   **Separate debt**

Any amount due from the Borrowers under this Clause 22 shall be due as a separate debt and shall not be affected by judgment being obtained for any other sums due under or in respect of this Agreement.

22.8   **Borrowers' right of prepayment**

The Borrowers may give seven (7) Banking Days notice to the Agent that they wish to prepay the Affected Lender's Contribution as a result of any amounts payable by the Borrowers under this Clause 22.  The relevant provisions of Clause 5.4 shall apply to that prepayment.

23.   **ILLEGALITY**

23.1   **Causes of illegality**

This Clause 23 applies if a Lender (the **"Affected Lender"**) notifies the Agent that the introduction of, or any change in, any applicable law or regulation, or in the interpretation thereof by any authority charged with the administration thereof or by any court of competent jurisdiction, makes it unlawful for any Lender to maintain or give effect to its obligations under this Agreement.

23.2   **Notification**

The Agent shall promptly notify the other Banks and the Borrowers of any notice which it receives from the Affected Lender under Clause 23.1.

23.3   **Mandatory prepayment**

On so notifying the Borrowers the Affected Lender's obligations under this Agreement shall terminate forthwith and the Borrowers shall immediately prepay the Affected Lender's Contribution.  The relevant provisions of Clause 5.4 shall apply to that prepayment.

23.4   **Force majeure**

No Lender will be liable for any failure on its part to provide its Commitment or maintain its Contribution or any part thereof resulting, directly or indirectly, from any action, inaction or purported action of any government or governmental agency or any strike, boycott or blockade or any cause whatsoever outside its control.

24.   **THE AGENT**

24.1   **Appointment of Agent**

Each Lender hereby irrevocably appoints and authorises the Agent to act as its agent under this Agreement and the other Security Documents.

24.2   **Agent's powers and discretions**

The Agent shall have such powers and discretions:

24.2.1   which are expressly delegated to the Agent by the terms of this Agreement and the other Security Documents;

24.2.2   which the Majority Lenders consider appropriate and give to the Agent (generally or in a particular case) with the Agent's consent; and

24.2.3 which the Agent considers to be reasonably incidental to the discharge and performance of any of its functions under this Agreement or any of the other Security Documents or otherwise appropriate in the context of those functions, including the exercise of any powers given to it by the Majority Lenders.

## 24.3 Agent is agent only

The relationship between the Agent and each Lender is that of agent and principal only. Nothing in this Agreement or the other Security Documents shall constitute the Agent a trustee or fiduciary for any Lender or any other person and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders a partnership, association, joint venture or other entity.

## 24.4 Agent to have no responsibility to Borrowers

In performing its functions and duties under this Agreement and the other Security Documents, the Agent shall act solely as agent of the Lenders and does not assume and shall not be deemed to have assumed any responsibility, liability or obligation (whether fiduciary or otherwise) towards, or relationship of agency or trust with or for, the Borrowers (or either of them) or any other Obligor in any circumstances whatsoever.

## 24.5 Matters within Agent's authority

Subject to Clause 24.6 and the other provisions of this Agreement and the other Security Documents, the Agent is hereby irrevocably authorised by the Lenders in their name and on their behalf (and shall, if so directed by written notice from the Majority Lenders after the Lenders shall have consulted for a period of not less than five (5) days, which direction shall be binding on all the Lenders):

24.5.1 to waive, modify, vary or otherwise amend or excuse performance of any provisions of this Agreement or any of the other Security Documents; and

24.5.2 to enforce or take or refrain from taking any other action or proceedings with regard to this Agreement or any of the other Security Documents,

## 24.6 Notification of proposed waivers and amendments

Except in cases where the Agent is of the opinion that the Lenders would be prejudiced by any delay in the Agent enforcing or taking action, in which event the Agent may, but shall not be obliged to, enforce or take action without prior notification to the Lenders, the Agent shall be obliged to notify the Lenders if it proposes to waive, modify, vary or otherwise amend or excuse performance of any provision of this Agreement or any of the other Security Documents or to enforce or take or refrain from taking any action under Clause 19.2 and the Agent shall not be entitled to proceed with that proposal unless the

Majority Lenders shall give notice to the Agent agreeing to that proposal. The Agent shall be entitled to cancel that proposal if written notice pursuant to this Clause 24.6 is not received within five (5) days of the Lenders being so notified by the Agent.

## 24.7 Agent to act in accordance with instructions of Majority Lenders

Unless a contrary intention appears in a Security Document:

24.7.1 the Agent shall exercise any right, power, authority or discretion vested in it as Agent in accordance with any written instructions given to it by the Majority Lenders (or, if

so instructed by the Majority Lenders, refrain from exercising any right, power, authority or discretion vesting in it as agent);

24.7.2   the Agent shall not be liable for any act or omission if it acts or refrains from taking action in accordance with an instruction of the Majority Lenders;

24.7.3   any instructions given by the Majority Lenders will be binding on all the Banks;

24.7.4   the Agent may refrain from acting in accordance with the instructions of the Majority Lenders (or if appropriate, the Lenders) until it has received such security as it may require for any cost, loss or liability (together with any associated VAT) which it may incur in complying with the instructions;

24.7.5   in the absence of instructions from the Majority Lenders, (or, if appropriate, the Lenders) the Agent may act (or refrain from taking action) as it considers to be in the best interest of the Lenders; and

24.7.6   the Agent is not authorised to act on behalf of a Lender (without first obtaining that Lender's written consent) in any legal or arbitration proceedings relating to any Security Document.

24.8   **Agent not required to act**

In no event shall the Agent be required to take any action which exposes, or is likely to expose, the Agent to personal liability or which is contrary to the provisions of:

24.8.1   this Agreement or any of the other Security Documents; or

24.8.2   any law, regulation or directive.

24.9   **Provision of copy documents to Lenders**

The Agent shall furnish each Lender:

24.9.1   with copies of any documents received by it under Clauses 16.2.12 and 16.2.13 (but the Agent shall not be obliged to review or check the accuracy or completeness thereof);

24.9.2   if requested by any Lender, with copies of all documents received by the Agent under Clauses 13.1 and 13.2;

24.9.3   with a copy of any notice received from the Borrowers or any other Obligor referring to this Agreement and stating that an Event of Default has occurred and is continuing; and

24.9.4   with the original or a copy of any document which is delivered to the Agent for that Lender by the Borrowers or any other Obligor.

24.10   **Provision of copy communications to Agent**

Each Lender will, promptly after receipt or despatch thereof, forward to the Agent a copy of any communication:

24.10.1 sent by that Lender to the Borrowers (or either of them) or any other Obligor; or

24.10.2 received by that Lender from the Borrowers (or either of them) or any other Obligor and, in each case, relating to this Agreement or any of the Security Documents.

**24.11   Distributions of sums received and deductions by Agent**

The Agent shall (subject to Clause 8.2) distribute promptly to each Lender its due proportion of all sums received by the Agent on behalf of the Lenders under this Agreement or any of the other Security Documents, subject to the Agent's right to deduct and withhold from any such payment any amount which is then (or which will, upon demand by the Agent, become) due and payable to the Agent from that Lender.

**24.12   Agent's retention of fees and expenses**

The Agent may retain for its own use and benefit (and shall not be liable to account to any Lender for all or any part of) any sums received by it by way of fees (and not payable to any Lender) or by way of reimbursement of expenses incurred by it.

**24.13   Waiver on instructions of Majority Lenders**

Subject to Clause 24.14, the provisions of this Agreement and any of the other Security Documents may be waived, and (subject to the written agreement of each of the other parties thereto, other than the Lenders) varied or amended, by the Agent acting on the written instructions of the Majority Lenders, in each case evidenced by an instrument in writing, and any such waiver, variation or amendment shall be binding upon all the Lenders.

**24.14   Consent of Agent and all Lenders required**

Nothing in Clause 24.13 shall authorise the effecting, without the prior written consent of the Agent and all the Lenders, of:

24.14.1 any change in the Applicable Margin or in the definitions of **"Majority Lenders"** or **"Security Documents"**;

24.14.2 any change in the date for, or alteration in the amount (or the basis of determining the amount) of, any payment of principal, interest, fees, or other amounts payable under this Agreement;

24.14.3 any change in a Lender's Commitment;

24.14.4 any extension of the Commitment Period;

24.14.5 any change to Clauses 2, 3, 4, 5, 6, 7, 11, 12, 14, 18, 28 or 35;

24.14.6 any change to this Clause 24.14;

24.14.7 the release of any of the security created by or pursuant to the Security Documents (or any of them); or

24.14.8 any other matter in respect of which the terms of this Agreement or any other of the Security Documents expressly requires the agreement of all the Lenders.

**24.15   Borrowers' reliance upon Agent**

At all times throughout the Security Period the Borrowers shall be entitled to rely upon the advice of the Agent as to the giving of any approvals or consents or the exercise of any discretions by the Lenders or any other act of the Lenders as required by this Agreement and/or the other Security Documents or any of them.

24.16 **Consultation by Agent with Lenders**

The Agent shall, subject to Clause 24.6, at all times:

24.16.1 consult with the Lenders before giving any approvals or consents or exercising any discretions or performing any other act which may be given or exercised or performed by the Agent under this Agreement or any of the other Security Documents; and

24.16.2 keep the Lenders informed of each and every approval or consent given and each exercise of any such discretion and each performance of any such other act which the Agent may have performed on behalf of the Lenders as required by this Agreement or any of the other Security Documents.

24.17 **Consent of Agent required**

Notwithstanding the provisions of Clause 24.13 and 24.14, no provision of this Agreement or of any other of the Security Documents which in any way relates to the duties, functions, powers or responsibilities of the Agent may be amended, waived or suspended without the prior consent of the Agent.

## 25. THE SECURITY TRUSTEE

25.1 **Trust Property defined**

In this Clause 25, "**Trust Property**" means:

25.1.1 all rights, title and interests that may be mortgaged, charged, pledged or assigned in favour of the Security Trustee under or by virtue of this Agreement and the other Security Documents;

25.1.2 all rights granted to, or held or exercisable by, the Security Trustee by virtue of this Agreement and the other Security Documents;

25.1.3 all moneys and other assets, which are received or recovered by or on behalf of the Security Trustee under or by virtue of any of the foregoing rights, including as a result of the enforcement or exercise of any such right; and

25.1.4 all moneys and other assets accrued in respect of or derived from any of the foregoing.

25.2 **Duties of Security Trustee**

The Security Trustee shall:

25.2.1 hold the Trust Property on trust for the Banks in accordance with provisions of this Agreement and the other Security Documents; and

25.2.2 perform and exercise the rights and benefits vested in it and deal with the Trust Property in accordance with the provisions of this Agreement and the other Security Documents.

25.3 **Security Trustee to have no responsibility to Borrowers**

The Security Trustee does not assume and shall not be deemed to have assumed any responsibility, liability or obligation (whether fiduciary or otherwise) towards, or relationship

of agency or trust with or for, either Borrower or any other Obligor in any circumstances whatsoever.

**25.4 Security Trustee's powers and discretions**

The Security Trustee shall have such powers and discretions:

25.4.1 which are expressly delegated to the Security Trustee by the terms of this Agreement and the other Security Documents;

25.4.2 which the Majority Lenders consider appropriate and give to the Security Trustee (generally or in a particular case) with the Security Trustee's consent;

25.4.3 which the Security Trustee considers to be reasonably incidental and conducive to the discharge and performance of any of its functions under this Agreement or any of the other Security Documents or otherwise appropriate in the context of those functions, including the exercise of any powers given to it by the Majority Lenders; and

25.4.4 which are conferred on a trustee by the Trustee Act 1925 and any other applicable law for the time being in force.

**25.5 Security Trustee to act in accordance with instructions of Majority Lenders**

Subject to the provisions of the Agreement and the other Security Documents, the Security Trustee agrees to act with respect to this Agreement and the other Security Documents in accordance with the written instructions of the Agent, or, if the Agent and the Security Trustee are the same person, the Majority Lenders. Any such instructions given by the Majority Lenders shall be binding on all the Banks. In the absence of any such instructions, the Security Trustee shall not be obliged to act.

**25.6 Security Trustee not required to act**

In no event shall the Security Trustee be required to take any action which exposes, or is likely to expose, the Security Trustee to personal liability or which is contrary to the provisions of:

25.6.1 this Agreement or any of the other Security Documents; or

25.6.2 any law, regulation or directive.

**25.7 Provision of copy documents to Banks**

The Security Trustee shall furnish the Agent, or, if the Agent and the Security Trustee are the same person, each Lender, with copies of any documents received by it under or in connection with this Agreement or any other Security Documents which it considers to be of material importance to the Banks.

**25.8 Transfer of moneys to Agent**

The Security Trustee shall, except as expressly stated to the contrary in this Agreement or any other Security Document, transfer any moneys forming part of the Trust Property to the Agent for application in accordance with the relevant provisions of this Agreement and the other Security Documents, subject to the Security Trustee's right to deduct and withhold from any such payment any amount which is then (or which will, upon demand by the Security Trustee, become) due and payable to it, or to any receiver or agent appointed by it, under the Security Documents.

25.9   **Security Trustee's retention of fees and expenses**

The Security Trustee may retain for its own use and benefit (and shall not be liable to account to any Lender for all or any part of) any sums received by it by way of fees (and not payable to any Lender) or by way of reimbursement of expenses incurred by it.

25.10   **Release of security**

At the end of the Security Period the Security Trustee shall release without any recourse, warranty or covenants for title whatsoever, all security granted to it pursuant to the Security Documents then held by it, whereupon the Security Trustee shall be discharged from all liabilities and obligations under this Agreement and the other Security Documents.

25.11   **Perpetuity period**

The perpetuity period applicable to the trusts created by this Clause 25 is eighty (80) years from the date of this Agreement.

26.   **RETIREMENT OF A SERVICE BANK**

26.1   **Resignation of Service Bank**

Each Service Bank may at any time resign its appointment under this Agreement by giving the Obligors and the other Banks not less than thirty (30) days' prior written notice to that effect.

26.2   **Appointment of successor by Majority Lenders**

After the giving by any Service Bank of a notice of termination the Majority Lenders may in writing appoint a successor.

26.3   **Appointment by retiring Service Bank**

If no such successor is appointed within the period specified in Clause 26.1, the relevant Service Bank may appoint as its successor any reputable bank or financial institution with an office in London.

26.4   **Consequence of change of Service Bank**

Upon the acceptance by a successor to a Service Bank of its appointment, which acceptance shall be in such form as the Majority Lenders shall approve:

26.4.1   that successor shall become bound by all the obligations of that Service Bank and become entitled to all the rights, privileges, powers, authorities and discretions of that Service Bank under this Agreement and the other Security Documents;

26.4.2   the obligations of that Service Bank under this Agreement and the other Security Documents shall terminate but without prejudice to any liabilities which that Service Bank may have incurred prior to that termination;

26.4.3   that Service Bank shall be discharged from any further liability or obligations under this Agreement and the other Security Documents; and

26.4.4   the provisions of this Agreement and the other Security Documents shall continue in effect for the benefit of that Service Bank in respect of any action taken or omitted to be taken by it or any event occurring before the termination of its obligations pursuant to this Clause 26.

**27.     LIMITS OF THE SERVICE BANKS' OBLIGATIONS**

27.1    **No duty to enquire**

Neither Service Bank shall be obliged to ascertain or enquire:

27.1.1   either initially or on a continuing basis, as to the credit or financial condition or affairs of the Borrowers (or either of them), any other Obligor or any other person;

27.1.2   as to the performance or observance by the Borrowers (or either of them) or any other Obligor of any of the terms and conditions of this Agreement or any of the other Security Documents or any other agreement; or

27.1.3   whether any Event of Default or Potential Event of Default has occurred, and until it shall have actual knowledge or express notice to the contrary, the Agent shall be entitled to assume that no Event of Default or Potential Event of Default has occurred.

27.2    **Responsibilities excluded**

Neither Service Bank and none of their respective officers, employees or agents shall be responsible to any other Bank for:

27.2.1   any failure or delay in performance, or breach by the Borrowers (or either of them), of their respective obligations under this Agreement or any of the other Security Documents or any other agreement or any failure or delay in performance, or breach by any of the other Obligors, of their respective obligations under any of the Security Documents or any other agreement; or

27.2.2   any recitals, statements, representations or warranties in, or for the legality, validity, effectiveness, enforceability, admissibility in evidence or sufficiency of, this Agreement or any of the other Security Documents or any other agreement; or

27.2.3   the legality, validity, effectiveness or enforceability of any of the security created, or purported to be created, pursuant to any of the Security Documents.

27.3    **Limitation of liability**

27.3.1   Neither Service Bank and none of their respective officers, employees or agents shall be liable for any loss, damage or expense suffered or incurred by either Borrower or any other Bank or any other person in consequence of any action taken or omitted to be taken by it under this Agreement or any of the other Security Documents or in connection herewith or therewith unless caused by its gross negligence or wilful misconduct.

27.3.2   Without prejudice to the provisions of Clause 27.3.1, none of the other parties to this Agreement shall take any proceedings against any officer, employee or agent of a Service Bank in respect of any claim which it may have against that Service Bank or in respect of any act or omission (including, without limitation, negligence or wilful misconduct) by that officer, employee or agent in relation to this Agreement or any of the other Security Documents.

27.3.3   Without prejudice to the provisions of Clause 27.3.1, the Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Security Documents to be paid by the Agent if the Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or

operating procedures of any recognised clearing or settlement system used by the Agent for that purpose.

### 27.4 Lenders' representations and undertakings

Each Lender and the Swap Bank:

27.4.1 severally represents and warrants to the Service Banks that it has made its own independent investigation of the financial condition and affairs of the Borrowers and the other Obligors in connection with the entry by that Lender into this Agreement or the Swap Bank into this Agreement or by the Swap Bank into the Master Agreement and in that respect has not relied on any information provided to it by either Service Bank; and

27.4.2 undertakes that it will continue to make its own independent appraisal of the creditworthiness of the Borrowers and the other Obligors and will not rely on any information provided to it by either Service Bank.

### 27.5 Indemnification by Lenders and the Swap Bank of Service Banks

The Lenders and the Swap Bank agree (which agreement shall survive payment of all sums due under this Agreement) to indemnify each Service Bank (to the extent not reimbursed by the Borrowers (or any of them)) rateably:

27.5.1 in the case of the Lenders, according to their respective Contributions (or, if no part of the Loan has been advanced, their respective Commitments), and

27.5.2 in the case of the Swap Bank, according to the maximum net exposure of the Borrowers to the Swap Bank determined in accordance with the terms of the Master Agreement as if it were terminated and/or closed out at that time or, as the case may be, if it has already been terminated and/or closed out, the aggregate amount (whether actual or contingent) payable thereunder,

from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against that Service Bank in performing its functions or duties under this Agreement or any of the other Security Documents, or in connection with any action taken or omitted to be taken by that Service Bank in enforcing or preserving or attempting to enforce or preserve the rights of the Lenders under this Agreement or any of the other Security Documents or any other documents or security.

### 27.6 Service Banks' rights

Each Service Bank may:

27.6.1 engage and pay for the advice and services of any lawyers, accountants or other experts whose advice or services may to that Service Bank seem necessary or desirable and that Service Bank shall be entitled to rely on the advice and opinions of such lawyers, accountants and other experts and shall not be liable to any of the other parties hereto for any of the consequences of any such reliance;

27.6.2 perform all or any of its functions and duties hereunder or under the Security Documents through employees or agents or any office or branch of that Service Bank from time to time selected by it and notified to the other parties hereto;

27.6.3   rely on any communication or document believed by it to be genuine and correct and to have been communicated or signed by the person by whom it purports to be communicated or signed and shall not be liable to any of the other parties hereto for any of the consequences of such reliance; and

27.6.4   without liability to account, make loans to, accept deposits from and generally engage in any kind of banking or trust business with the Borrowers (or either of them) or the other Obligors as though that Service Bank was not a Service Bank.

## 27.7   Service Banks as Lenders and Swap Bank

If it is also a Lender, each Service Bank shall have the same rights and powers under this Agreement as any other Lender (or the Swap Bank if it is the Swap Bank) and may exercise those rights and powers as though it were not a Service Bank..

## 28.   SHARING OF PAYMENTS

### 28.1   Relevant circumstances

This Clause 28 applies if any Lender (the "Sharing Lender") at any time receives or recovers (whether by way of voluntary or involuntary payment, by virtue of the exercise of its legal rights including but not limited to the right of set-off, counterclaim or otherwise howsoever) the whole or any part of any amounts due to it from the Borrowers (or either of them) under this Agreement or any of the other Security Documents otherwise than by distribution from the Agent in accordance with the terms of this Agreement.

### 28.2   Payment by Sharing Lender to Agent

Subject to Clauses 28.3 and 28.4:

28.2.1   the Sharing Lender shall forthwith pay to the Agent the full amount or (as the case may be) an amount equal to the equivalent of the full amount so received or recovered;

28.2.2   as between the Borrowers and the Sharing Lender, the Borrowers shall remain or again become indebted to such Sharing Lender under this Agreement in the amount so paid as if it had not been received or recovered as aforesaid; and

28.2.3   the Agent shall treat the amount so paid as if it were a payment by the Borrowers on account of amounts due from the Borrowers under this Agreement or any of the other Security Documents for distribution to the Sharing Lender and such of the other Lenders in the proportions in which the Sharing Lender and the other Lenders would have been entitled to receive such amount had it been paid by the Borrowers to the Agent hereunder or under such Security Documents.

### 28.3   Refund by Agent

Any payment and adjustment made pursuant to Clause 28.2 shall be subject to the condition that, if the amount (or any part thereof) so paid by the Sharing Lender to the Agent subsequently falls to be repaid by the Sharing Lender to the Borrowers (or either of them) or any other person, then each of the Lenders who has received any part thereof from the Agent shall repay the amount received by it to the Sharing Lender, together with such amount (if any) as is necessary to reimburse the Sharing Lender the appropriate portion of any interest it has been obliged to pay when repaying such amount as aforesaid, and the relevant adjustments pursuant to Clause 28.2 shall be cancelled.

29.4    **Subordination**

Neither Borrower (hereinafter called a **"Creditor Borrower"**) will without the prior written consent of the Agent or unless so directed by the Agent (whereupon that Borrower shall act in accordance with the Agent's directions) ask, demand, sue for, take or receive from any other Borrower (hereinafter called a **"Debtor Borrower"**) by set-off or any manner the whole or any part of all present and future sums, liabilities and obligations payable or owing by a Debtor Borrower to a Creditor Borrower whether actual or contingent, jointly or severally or otherwise howsoever, until the Outstanding Indebtedness has been paid and discharged in full.

30.     **ASSIGNMENTS AND TRANSFERS**

30.1    **Successors and assigns**

This Agreement shall be binding upon and inure to the benefit of each party hereto and its successors and assigns.

30.2    **No assignment by Borrowers**

Neither Borrower may assign or transfer all or any of its rights, benefits or obligations under this Agreement or under any of the other Security Documents without the prior written consent of the Agent with the Majority Lenders' authority.

30.3    **Transfer by Lenders**

Any Lender (the **"Transferor Lender"**) may transfer all or any of its rights and/or obligations in its capacity as a Lender under this Agreement and under the other Security Documents to another bank or financial institution (the **"Transferee Lender"**). That transfer shall be effected by the delivery by the Transferor Lender to the Agent of a Transfer Certificate executed by the Transferor Lender and the Transferee Lender. Any such transfer shall not be effective unless it is effected by a Transfer Certificate.

30.4    **Signature of Transfer Certificate**

The Agent shall as soon as practicable but not later than the fifth (5th) Banking Day after receipt by it of a Transfer Certificate:

30.4.1  sign the Transfer Certificate on behalf of the Obligors, itself and each of the other Banks; and

30.4.2  give notice to the Obligors and the Banks of receipt, and attaching a copy, duly signed by it, of that Transfer Certificate.

30.5    **Authorisation of Agent to sign Transfer Certificate**

Each Borrower, each Lender and the Security Trustee irrevocably authorise the Agent to sign any Transfer Certificate on its behalf.

30.6    **Effective date of Transfer Certificate**

A Transfer Certificate shall be effective on the later of:

30.6.1  the date specified in that Transfer Certificate; and

30.6.2  the date of receipt by the Obligors and the Banks of the notice given by the Agent pursuant to Clause 30.4.2.

30.7   **Effect of Transfer Certificate**

A Transfer Certificate shall have effect in accordance with the following:

30.7.1   to the extent that in that Transfer Certificate the Transferor Lender seeks to transfer its rights and/or its obligations under this Agreement and the other Security Documents, each Obligor and the Transferor Lender shall each be released from further obligations to the other under this Agreement and the other Security Documents and their respective rights against each other shall be cancelled (such rights and obligations being referred to in this Clause 30.7 as **"discharged rights and obligations"**);

30.7.2   each Obligor, the Transferee Lender and the other Banks shall each assume obligations towards each other and/or acquire rights against each other which differ from the discharged rights and obligations only insofar as the Transferee Lender has assumed and/or acquired the same in place of the Transferor Lender; and

30.7.3   the Transferee Lender and the other Banks shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had the Transferee Lender been an original party to this Agreement as a Lender with the rights and/or obligations acquired or assumed by it as a result of that transfer.

30.8   **Transfer fee**

The Transferee Lender shall pay to the Agent for its own account a transfer fee of $500 on the date on which the transfer effected by the relevant Transfer Certificate becomes effective.

30.9   **Sub-participation by Lenders**

Any Lender may at any time without the consent of the Borrowers or any other Obligor sub-participate all or any of its rights and/or obligations under this Agreement and the other Security Documents.

30.10   **Disclosure of information**

Any Lender may disclose to any potential Transferee Lender, assignee or sub-participant, or to any other party with whom it may propose to enter into contractual relations in connection with this Agreement or any other of the Security Documents, such information about the Borrowers and the other Obligors and their respective businesses, assets or financial condition as that Lender shall consider appropriate.

30.11   **Change of lending office**

Any Lender may at any time and from time to time change its lending office by giving notice to the Agent and that change shall be effective on the later of:

30.11.1 the date specified in that notice; and

30.11.2 the date of receipt by the Agent of that notice from that Lender.

The Agent shall promptly notify the Obligors and the other Banks of any notice received by it pursuant to this Clause 30.11.

30.12   **Delegation**

Any Bank may at any time and from to time to time delegate any one or more of its rights, powers and/or obligations under this Agreement and the other Security Documents to any person.

30.13   **Further assurance**

Each Borrower undertakes to do or to procure all such acts and things and to sign, execute and deliver or procure the signing, execution and deliver of all such instruments and documents as the Agent may reasonably require for the purpose of perfecting any such assignment, transfer, sub-participation, change or delegation as aforesaid.

30.14   **Register**

The Agent shall keep a register of all the Lenders for the time being with details of their respective Commitments, Contributions and lending offices and shall provide any other party to this Agreement (at that party's expense) with a copy of the register on request.

30.15   **Swap Bank**

The Swap Bank may not assign or transfer all or any of its rights, benefits or obligations under this Agreement or under any of the other Security Documents with the prior written consent of the Agent with the Majority Lenders' authority.

31.   **SET-OFF**

31.1   **Set-off**

The Borrowers authorise each Bank without prejudice to any of that Bank's rights at law in equity or otherwise, at any time and without notice to the Borrowers:

31.1.1   to combine and/or consolidate all or any accounts (whether current, deposit, loan or of any other nature whatsoever, whether subject to notice or not and in whatever currency) of the Borrowers (or either of them) with any branch of that Bank;

31.1.2   to apply any credit balance (whether or not then due) on any such account or accounts of the Borrowers (or either of them) in or towards satisfaction of any sum due and payable but not paid to that Bank and any other liability of the Borrowers (or either of them) (whether actual or contingent) under this Agreement and/or any of the Security Documents; and

31.1.3   to do in the name of the Borrowers (or either of them) and/or that Bank all such acts and execute all such documents as may be necessary or expedient to effect such application.

31.2   **Purchase of other currencies**

For all or any of the above purposes, each Bank is authorised to purchase with the moneys standing to the credit of such account or accounts any such other currency or currencies as may be necessary to effect such application.  No Bank shall be obliged to exercise any right given to it by this Clause 31.

31.3   **Master Agreement Set off**

If any Borrower is a defaulting party under the Master Agreement, the Swap Bank, as the non-defaulting party, may (without prejudice to or limitation of its right of set-off under

section 6(e) of the Master Agreement and its rights under Clause 31.1) at the same time as, or at any time after, the Borrowers' default set-off any amount due from the Borrowers to the Swap Bank under this Agreement against any amount due from the Lenders to the Borrowers under the Master Agreement, and apply the first amount in discharging the second amount. The effect of any set-off under this Clause 31.3 shall be effective to extinguish or, as the case may require, reduce the liabilities of the Lenders under the Master Agreement

## 32.    MISCELLANEOUS

### 32.1    Time of essence

Time is of the essence as regards every obligation of the Borrowers under this Agreement and the other Security Documents, but no delay or omission by any Bank to exercise any right, power or remedy vested in it under this Agreement or any other of the Security Documents or by law shall impair such right, power or remedy, or be construed as a waiver of, or as an acquiescence in, any default by the Borrowers (or either of them).

### 32.2    No waiver

If any Bank on any occasion agrees to waive any such right, power or remedy, such waiver shall not in any way preclude or impair any further exercise thereof or the exercise of any other right, power or remedy.

### 32.3    Waivers to be in writing

Any waiver by any Bank of any provision of this Agreement or any other of the Security Documents, and any consent or approval given by any Bank shall only be effective if given in writing and then only strictly for the purpose and upon the terms for which it is given.

### 32.4    Amendments to be in writing

Neither this Agreement nor any of the other Security Documents may be amended or varied orally but only by an instrument signed by the Majority Lenders or all the Lenders (as may be applicable) or, as the case may be, the Agent and/or the Security Trustee on behalf of the Majority Lenders or all the Lenders (as may be applicable), and each of the other parties thereto.

### 32.5    Remedies cumulative

The rights, powers and remedies of the Banks contained in this Agreement and the other Security Documents are cumulative and not exclusive of each other nor of any other rights, powers or remedies conferred by law, and may be exercised from time to time and as often as the Banks may think fit.

### 32.6    Severability

If at any time one or more of the provisions of this Agreement or any other of the Security Documents is or becomes invalid, illegal or unenforceable in any respect under any law by which it may be governed or affected, the validity, legality and enforceability of the remaining provisions shall not be in any way affected or impaired as a result.

### 32.7    Counterparts

This Agreement may be executed in any number of counterparts and all such counterparts taken together shall be deemed to constitute but one and the same instrument.

**32.8    Conclusiveness of Banks' certificates**

The certificate or determination of a Bank of a rate or amount under this Agreement and any other Security Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates and is binding on the Borrowers.

**32.9    Previous offers by or on behalf of the Banks superseded**

This Agreement shall in all respects supersede the terms of any offer or commitment with respect to the Loan made by or on behalf of the Banks to the Borrowers or their agents prior to the date of this Agreement (save for any provision relating to payment of the Banks' fees and expenses.

**33.    FURTHER ASSURANCE**

**33.1    Borrowers' duties**

Each Borrower shall, upon demand, and at its own expense, sign, perfect, do, execute and register all such further assurances, documents, acts and things as the Agent may require for the purpose of more effectually accomplishing or perfecting the transaction or security contemplated by this Agreement.

**34.    NOTICES**

**34.1    Addresses**

All notices (which expression includes any demand, request, consent or other communication) to be given by one party to the others under this Agreement and the other Security Documents shall be in writing and (unless delivered personally) shall be given by telefax or first class pre-paid post (airmail if sent internationally) and be addressed:

34.1.1   in the case of the Agent, as follows:

Credit Suisse
St. Alban-Graben 1-3
CH-4002 Basel
Switzerland.

Telefax No:      00 41 61 266 79 39
Attn:               Mr. John Haefelfinger

34.1.2   in the case of the Security Trustee, as follows:

Credit Suisse
St. Alban-Graben 1-3
CH-4002 Basel
Switzerland.

Telefax No:      00 41 61 266 79 39
Attn:               Mr. John Haefelfinger

34.1.3   in the case of a Lender at the address set out beneath its name in Schedule 1; and

34.1.4   in the case of the Borrowers, as follows:

6 Elder Street

London E1 6BT

Telefax No:     +44 207 242 2700

Attn:           Director, Legal, Administration & PR

## 34.2 Changes of address

If any Bank or either Borrower wishes to change its or their address for communication, the one shall give to the others not less than five (5) Banking Days' notice in writing of the change desired.

## 34.3 Deemed receipt of notices

Notices addressed as provided above shall be deemed to have been duly given when despatched (in the case of telefax), when delivered (in the case of personal delivery), two (2) days after posting (in the case of letters sent within the same country), or five (5) days after posting (in the case of letters sent internationally), provided that notices to the Agent or the Security Trustee shall be effective only upon their actual receipt by the Agent or the Security Trustee (as appropriate). In each of the above cases any notice received on a non-working day or after business hours in the country of receipt shall be deemed to be given on the next following working day in such country.

## 34.4 English language

All notices and documents to be given or delivered pursuant to or otherwise in relation to this Agreement and the other Security Documents shall be in the English language or be accompanied by a certified English translation.

## 35.   APPLICABLE LAW AND JURISDICTION

## 35.1 Governing law

This Agreement shall be governed by and construed in accordance with English law.

## 35.2 Submission to jurisdiction

Each Borrower hereby irrevocably agrees for the exclusive benefit of the Banks that the English courts shall have jurisdiction in relation to any dispute and any suit, action or proceeding (referred to together in this Clause 35 as "**Proceedings**") which may arise out of or in connection with this Agreement and/or any of the other Security Documents, and for such purposes irrevocably submits to the jurisdiction of such courts.

## 35.3 Service of process

Each Borrower hereby irrevocably agrees:

35.3.1  that, for the purpose of Proceedings in England, any legal process may be served upon Foresight Limited of 6 Elder Street, London E1 6BT, who is hereby authorised to accept service on behalf of the Borrowers, which shall be deemed to be good service on the Borrowers; and

35.3.2  that throughout the Security Period it will maintain a duly appointed process agent in England, duly notified to the Agent, and that failure by any such process agent to give notice thereof to it shall not impair the validity of such service or of a judgment or order based thereon.

### 35.4   Choice of forum

Nothing in this Clause 35 shall affect the right of any Bank to serve process in any manner permitted by law or limit the right of any Bank to take Proceedings against the Borrowers (or either of them) in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings by any Bank in any other jurisdiction, whether concurrently or not.

Neither Borrower shall commence any Proceedings in any country other than England in relation to any matter arising out of or in connection with this Agreement and/or any of the other Security Documents.

### 35.5   Forum convenience

Each Borrower irrevocably waives any objection which it may now or hereafter have on the grounds of inconvenient forum or otherwise to Proceedings being brought in any such court as is referred to in this Clause 35, and further irrevocably agrees that a judgment or order in any Proceedings brought in the English courts shall be conclusive and binding upon the Borrowers and may be enforced without review in the courts of any other jurisdiction.

### 35.6   Consent

Each Borrower consents generally in respect of any Proceedings arising out of or in connection with this Agreement to the giving of any relief or the issue of any process in connection with such Proceedings, including without limitation, the making, enforcement or execution against any property or assets whatsoever of any order or judgment which may be made or given in such Proceedings.

### 35.7   Waiver of immunity

To the extent that either Borrower may be entitled in any jurisdiction to claim for itself or its property or assets immunity in respect of its obligations under this Agreement from service of process, jurisdiction, suit, judgment, execution, attachment (whether before judgment, in aid of execution or otherwise) or legal process, or to the extent that in any such jurisdiction there may be attributed to it or its property or assets such immunity (whether or not claimed) the Borrowers irrevocably agree not to claim and irrevocably waive such immunity to the fullest extent permitted by the laws of such jurisdiction.

**AS WITNESS** the hands of the duly authorised representatives of the parties hereto the day and year first before written.

## SCHEDULE 1

## LENDERS AND COMMITMENTS

| Lender | Lending Office | Commitment | |
|---|---|---|---|
| | | **Tranche A** | **Tranche B** |
| Credit Suisse | St Alban-Graben 1-3, Basel, Switzerland | | |
| | | $ | |

## SCHEDULE 2

## FORM OF NOTICE OF DRAWDOWN

TO:             Credit Suisse
                     St Alban-Graben 1-3
                     Basel
                     Switzerland

ATTN:        Shipping Finance

Dear Sirs,

### NOTICE OF DRAWDOWN

We refer to the Loan Agreement dated      August 2006 (the **"Loan Agreement"**) made between (1) ourselves as joint and several Borrowers (2) the Lenders, (3) yourselves as Swap Bank (4) yourselves as Agent and (5) the Security Trustee  providing for a loan to ourselves of up to US$110,000,000 in two Tranches. Expressions defined in the Loan Agreement shall have the same meanings when used in this letter.

Pursuant to Clause 3 of the Loan Agreement we hereby give you notice that we wish to draw an Advance of [Tranche A] [Tranche B] as follows:

Amount of Advance           :      US$[●]

Proposed Drawdown Date      :      [●]

Duration of first Interest Period  :      [●]

We hereby request and authorise you to apply the proceeds of the Loan by paying the proceeds by [●], to [●] Account No. [●], quoting the reference [●].

We confirm that:

(a)      the representations and warranties made by us as set out in Clause 15 of the Loan Agreement are true and accurate on the date hereof as if made on such date; and

(b)      no Event of Default or Potential Event of Default has occurred and is continuing or will occur as a result of the proposed borrowing.

Yours faithfully,

.....................................................

For and on behalf of

**PORLOCK MARITIME COMPANY LIMITED**
**TREMAIN SHIPING COMPANY LIMITED**

## SCHEDULE 2

## FORM OF NOTICE OF DRAWDOWN

TO:         Credit Suisse
                 St Alban-Graben 1-3
                 Basel
                 Switzerland

ATTN:      Shipping Finance

Dear Sirs,

### NOTICE OF DRAWDOWN

We refer to the Loan Agreement dated        August 2006 (the "**Loan Agreement**") made between (1) ourselves as joint and several Borrowers (2) the Lenders, (3) yourselves as Swap Bank (4) yourselves as Agent and (5) the Security Trustee  providing for a loan to ourselves of up to US$110,000,000 in two Tranches.  Expressions defined in the Loan Agreement shall have the same meanings when used in this letter.

Pursuant to Clause 3 of the Loan Agreement we hereby give you notice that we wish to draw an Advance of [Tranche A] [Tranche B] as follows:

Amount of Advance          :     US$[●]

Proposed Drawdown Date    :     [●]

Duration of first Interest Period  :     [●]

We hereby request and authorise you to apply the proceeds of the Loan by paying the proceeds by [●], to [●] Account No. [●], quoting the reference [●].

We confirm that:

(a)      the representations and warranties made by us as set out in Clause 15 of the Loan Agreement are true and accurate on the date hereof as if made on such date; and

(b)      no Event of Default or Potential Event of Default has occurred and is continuing or will occur as a result of the proposed borrowing.

Yours faithfully,

.....................................................

For and on behalf of

**PORLOCK MARITIME COMPANY LIMITED**
**TREMAIN SHIPING COMPANY LIMITED**

## SCHEDULE 3

### CONDITIONS PRECEDENT DOCUMENTS AND EVIDENCE

The documents and evidence referred to in Clause 13 are as follows:

A.   **Documents and evidence to be received on or before the date on which the first  Notice of Drawdown is given by the Borrowers**

1.   Certified copies of the certificate of incorporation and the constitutional documents of each Obligor.

2.   A certificate of good standing for each Obligor or other evidence that each Obligor is in good standing in its country of incorporation.

3.   A certificate of incumbency of each Obligor, signed by the secretary or a director of that Obligor stating its officers and directors.

4.   A certificate as to the shareholding of each Obligor, signed by the secretary or a director of that Obligor, stating the full names and addresses of the person or persons legally and beneficially entitled as shareholders/stockholders of the entire issued and outstanding shares/stock of that Obligor.

5.   Certified copies of resolutions duly passed by the directors and the shareholders of each Obligor at separate meetings evidencing approval of the transactions contemplated by this Agreement and the other Security Documents and the Transaction Documents and authorising the execution of the same.

6.   The original of any power of attorney issued by each Obligor in favour of any person or persons executing this Agreement and the other Security Documents.

7.   Certified copies of all licences, authorisations, approvals and consents required in connection with the execution, delivery, performance, validity and enforceability of the Security Documents and the Transaction Documents.

8.   Such certificates and documents as each Bank may require to comply with any money-laundering prevention procedures applicable to it.

9.   Certified copies of the Transaction Documents and of all documents, signed or issued by either Borrower, and/or the other parties thereto under or in connection therewith.

10.  The Security Documents referred to in Clause 14.2 and all documents, instruments, notices and acknowledgements thereto required under those Security Documents duly executed by the relevant Obligors.

11.  Evidence that the Earnings Accounts have been duly opened by the Borrowers with the Agent and that all board resolutions, mandates, signature cards and other documents or evidence required in connection with the opening, maintenance and operation of the Earnings Accounts have been duly delivered to the Agent.

12.  Confirmation from the agents in England nominated in this Agreement and elsewhere in the Security Documents by each Obligor for the acceptance of service of process, that they consent to such nomination.

13. Favourable opinions from the Agent's legal advisers with respect to each Obligor, and the overall transaction contemplated by this Agreement, in such terms as the Agent may require.

14. A valuation of both Vessels dated not earlier than ten days prior to the Drawdown Date by a valuer nominated or approved by the Agent evidencing a market value of each Vessel acceptable in all respects to the Agent.

15. An inspection report of one of the Vessels by a surveyor nominated or approved by the Agent acceptable in all respects to the Agent.

16. An opinion from the Agent's insurance advisers on the Insurances satisfactory in all respects to the Agent.

17. A detailed operating budget for the Vessels including, but not limited to, earnings estimates, Operating Expenses, drydocking provisions, insurances and administration expenses.

18. Certified copies of the Initial Charters in respect of both Vessels.

19. Evidence as to the registration of each Vessel in the ownership of the relevant Seller.

20. Evidence satisfactory to the Agent in all respects of compliance by the Borrowers, the Approved Manager and the Vessels with the requirements of the ISM Code.

21. Evidence satisfactory to the Agent in all respects of compliance by each Borrower, the Approved Manager and the Vessels with the applicable requirements of the ISPS Code and of Chapter XI-2 of the Safety of Life at Sea Convention 1974 (SOLAS).

**B.** **In relation to each Vessel, documents and evidence to be received on or before the applicable Drawdown Date**

1. The Security Documents specified in Clause 14.3 and all documents, instruments, notices and acknowledgements thereto required under those Security Documents duly executed by the relevant Obligors, and, in the case of the Mortgage of the relevant Vessel, evidence that that Mortgage has been duly registered or is capable of immediate registration with the required priority in the appropriate register.

2. Evidence that, in relation to such Vessel:

   (a) that Vessel has been unconditionally delivered by the relevant Seller to the relevant Borrower under the relevant MOA;

   (b) the full purchase price in respect of that Vessel payable under the relevant MOA has been duly paid;

   (c) that Vessel is in the absolute ownership of the relevant Borrower as the sole, legal and beneficial owner of the Vessel free from all Encumbrances save for any Encumbrances created by or pursuant to the Security Documents;

   (d) that Vessel is duly registered under the relevant flag specified in Schedule 5 in the sole ownership of the relevant Borrower;

   (e) that Vessel is in compliance with all applicable laws, regulations and requirements (statutory or otherwise) applicable to ships registered under the relevant flag specified in Schedule 5 and engaged in the service in which the Vessel is or is to be engaged;

   (f) that Vessel is operationally seaworthy and in every way fit for service;

(g)    that Vessel maintains the Classification specified in Schedule 5 with the Classification Society free from all recommendation, notations and average damage;

(h)    that Vessel has been delivered to and accepted by the Approved Charterer on the terms of the relevant Initial Charter;

(i)    that Vessel is managed by the Approved Manager on the terms of the Approved Management Agreement; and

(j)    that Vessel is insured in accordance with the provisions of the relevant Security Documents and all requirements of those Security Documents in respect of the Insurances and the noting of the Security Trustee's interest thereon have been complied with.

3.    An amount of $100,000 is credited to the relevant Earnings Account.

4.    Such updating documents and evidence in respect of any matters referred to at A. above as the Agent may require.

C.    Unless otherwise specified, each copy document referred to in this Schedule shall be certified as a true and complete and up-to-date copy of the original by a director or the secretary of the relevant Obligor or by another person acceptable to the Agent.

## SCHEDULE 4

## FORM OF TRANSFER CERTIFICATE

### TRANSFER CERTIFICATE

Lenders are advised not to employ Transfer Certificates or otherwise to assign or transfer interests in the Agreement without first ensuring that the transaction complies with all applicable laws and regulations, including the Financial Services and Markets Act 2000 and regulations made thereunder and similar statutes which may be in force in other jurisdictions.

To:　　　　　　[●] as agent on its own behalf and for and on behalf of the Borrowers and Lenders defined in the Agreement referred to below:

Attention:　　　[●]

1.　　This Transfer Certificate relates to a loan agreement (the **"Loan Agreement"**) dated [●] and made between (1) [●] each as joint and several borrowers (the **"Borrowers"**), (2) the banks and financial institutions defined therein as lenders (the **"Lenders"**), (3) [●] as agent and (4) [●] as security trustee (as the same may from time to time be amended or varied).

2.　　Terms defined in the Loan Agreement shall, unless otherwise defined herein, have the same meanings when used in this Transfer Certificate.

3.　　In this Certificate:

　　　**"Relevant Party"** means each Obligor and each Bank;

　　　**"Transferor Lender"** means [full name] of [lending office]; and

　　　**"Transferee Lender"** means [full name] of [lending office].

4.　　The Transferor Lender as beneficial owner hereby transfers to the Transferee Lender absolutely in accordance with Clause 30 of the Loan Agreement all its rights and benefit (present, future or contingent) under the Loan Agreement and the other Security Documents to the extent of [●] per cent. ([●]%) of the Transferor Lender's Contribution outstanding, details of which are set out below:

| **Transferor Lender's Contribution** | **Amount to be Transferred** |
|---|---|
|  |  |
|  |  |
|  |  |

5.　　By virtue of this Transfer Certificate and Clause 30 of the Loan Agreement the Transferor Lender is discharged [entirely from its Commitment][from [●] per cent. of its Commitment].

6.　　The Transferee Lender hereby requests the Agent and the Lenders to accept the executed copies of this Transfer Certificate as being delivered pursuant to and for the purposes of Clause 30 of the Loan Agreement so as to take effect in accordance with the terms thereof on [●].

7.  The Transferee Lender:

(a)  confirms that it has received copies of the Loan Agreement and the other Security Documents together with such other documents and information as it has required in connection with the transaction contemplated thereby;

(b)  confirms that it has not relied and will not hereafter rely on the Transferor Lender, any other Lender, the Agent or the Security Trustee to check or enquire on its behalf into the legality, validity, effectiveness, adequacy, accuracy or completeness of the Loan Agreement, any of the other Security Documents or any such other documents or information;

(c)  agrees that it has not relied and will not rely on the Transferor Lender, any other Lender, the Agent or the Security Trustee to assess or keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of the Borrowers or any other party to the Loan Agreement or any of the other Security Documents (save as otherwise expressly provided therein);

(d)  warrants to the Transferee Lender and each Relevant Party that it has power and authority to become a party to the Loan Agreement and has taken all necessary action to authorise execution of this Transfer Certificate and to obtain all necessary approvals and consents to the assumption of its obligations under the Loan Agreement and the other Security Documents;

(e)  if not already a Lender, appoints the Agent and the Security Trustee to act as its agent and security trustee respectively as provided in the Loan Agreement and the other Security Documents and agrees to be bound by the terms thereof; and

(f)  confirms the accuracy of the administrative details set out in the Schedule to this Transfer Certificate.

8.  The Transferor Lender:

(a)  warrants to the Transferee Lender and each Relevant Party that it has full power to enter into this Transfer Certificate and has taken all corporate action necessary to authorise it to do so; and

(b)  undertakes with the Transferee Lender that it will, at its own expense, execute any documents which the Transferee Lender reasonably requests for perfecting in any relevant jurisdiction the Transferee Lender's title under this Transfer Certificate or for a similar purpose.

9.  The Transferee Lender hereby undertakes with the Transferor Lender and each Relevant Party that it will perform all those obligations which by the terms of the Loan Agreement will be assumed by it after this Transfer Certificate takes effect.

10.  If this Transfer Certificate takes effect during an Interest Period, the Agent shall make all payments which would have become due to the Transferor Lender under the Loan Agreement during that Interest Period if no such transfer had been effected to the Transferor Lender and the Transferee Lender according to the percentages of the Transferor Lender's Contribution and Commitment transferred and retained pursuant to Clauses 4 and 5 of this Transfer Certificate, and the Transferor Lender and the Transferee Lender shall be responsible for paying to each other pro rata all amounts (if any) due to them from each other for that Interest Period. On and from the commencement of the immediately succeeding Interest Period, the Agent shall make all payments due under the Loan Agreement for the account of the Transferor Lender to the Transferor Lender and shall make all payments due under the Loan

Agreement for the account of the Transferee Lender to the Transferee Lender. This provision is for administrative convenience only and shall not affect the rights of the Transferor Lender and the Transferee Lender under the Loan Agreement.

11.     None of the Transferor Lender, any other Lender, the Agent or the Security Trustee:

    (a)     makes any representation or warranty nor assumes any responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of the Loan Agreement or any of the other Security Documents or any other document relating thereto;

    (b)     assumes any responsibility for the financial condition of the Borrowers or any other party to the Loan Agreement or any of the other Security Documents or any other document relating thereto or for the performance and observance thereof by (save as otherwise expressly provided therein) and any and all such conditions and warranties, whether expressed or implied by law or otherwise, are hereby excluded (except as aforesaid).

12.     The Transferor Lender and the Transferee Lender undertake that they will on demand fully indemnify the Agent and the Security Trustee in respect of any claim, proceeding, liability or expense which relates to or results from this Transfer Certificate or any matter connected with or arising out of it unless caused by the Agent's or Security Trustee's gross negligence or wilful misconduct, as the case may be.

13.     The agreements and undertaking of the Transferee Lender in this Transfer Certificate are given to and for the benefit of and made with each of the Relevant Parties.

14.     This Transfer Certificate shall be governed by, and construed in accordance with, English law.

**Transferor Lender**

By: [●]

Dated: [●]

**Transferee Lender**

By: [●]

Dated: [●]

**Agent** (for and on behalf of itself and for every other Relevant Party)

By: [●]

Dated: [●]

**Note:**   The execution of this Transfer Certificate alone may not transfer a proportionate share of the Transferor Lender's interest in the security constituted by the Security Documents in the Transferor Lender's or Transferee Lender's jurisdiction. It is the responsibility of each individual Lender to ascertain whether any other documents are required to perfect a transfer of such a share in the Transferor Lender's interest in such security in any such jurisdiction, and, if so, to seek appropriate advice and arrange for execution of the same.

**SCHEDULE**

**ADMINISTRATIVE DETAILS OF TRANSFEREE LENDER**

Name of Transferee Lender:

Lending Office:

Contact Person

(Loan Administration Department):

Telephone:

Fax:

Contact Person

(Credit Administration Department):

Telephone:

Fax:

Account for Payments:

## SCHEDULE 5

## DETAILS OF THE VESSELS

| Owner | Vessel Name | Flag | Classification Society | Classification | Official No. |
|---|---|---|---|---|---|
| Porlock | BAREILLY | Liberian | | | 13054 |
| Tremain | KANPUR | Liberian | | | 13055 |

**THE BORROWERS**

SIGNED for and on behalf ) 
of **PORLOCK MARITIME** ) 
**COMPANY LIMITED** ) 
By PHILIPPA WRIGHT ) 
its duly appointed attorney ) 
in the presence of: )

Michael Twick

Holman Fenwick & Willan

SIGNED for and on behalf ) 
of **TREMAIN SHIPPING** ) 
**COMPANY LIMITED** ) 
by R. SREENIVASA ) 
its duly appointed attorney ) 
in the presence of: )

Michael Twick

Holman Fenwick & Willan

**THE LENDERS**

SIGNED for and on behalf ) 
of **CREDIT SUISSE** ) 
by ROBIN BALMER ) 
its duly appointed attorney ) 
in the presence of: )

Michael Twick

Holman Fenwick & Willan

**THE SWAP BANK**

SIGNED for and on behalf ) 
of **CREDIT SUISSE** ) 
by ROBIN BALMER ) 
its duly appointed attorney ) 
in the presence of: )

Michael Twick

Holman Fenwick & Willan

**THE AGENT**

SIGNED for and on behalf )
of **CREDIT SUISSE** )
by  ROBIN  BALMER )
its duly appointed attorney )
in the presence of: )

Michael Zerick

Holman Fenwick & Willan


**THE SECURITY TRUSTEE**

SIGNED for and on behalf )
of **CREDIT SUISSE** )
by  ROBIN  BALMER )
its duly appointed attorney )
in the presence of: )

Michael Zerick

Holman Fenwick & Willan

DATED    27    March 2013

**PORLOCK MARITIME COMPANY LIMITED**
and
**TREMAIN SHIPPING COMPANY LIMITED**
as joint and several Borrowers

- and –

**THE BANKS AND FINANCIAL INSTITUTIONS**
listed in Schedule 1
as Lenders

- and -

**CREDIT SUISSE AG**
as Agent

- and -

**CREDIT SUISSE AG**
as Swap Bank

- and -

**CREDIT SUISSE AG**
as Security Trustee

---

**AMENDMENT NO. 1 TO THE**
**SECURED LOAN AGREEMENT**
**ORIGINALLY DATED 19 SEPTEMBER 2006**

---

**THIS AGREEMENT** is made on     2 7        March 2013

**BETWEEN**

(1) **PORLOCK MARITIME COMPANY LIMITED** and **TREMAIN SHIPPING COMPANY LIMITED** as joint and several Borrowers; and

(2) **THE BANKS AND FINANCIAL INSTITUTIONS** listed in Schedule 1 as Lenders;

(3) **CREDIT SUISSE AG** as Agent;

(4) **CREDIT SUISSE AG** as Swap Bank; and

(5) **CREDIT SUISSE AG** as Security Trustee

and amends the (originally) $110,000,000 secured loan facility agreement dated 19 September 2006 made between (1) the Borrowers as joint and several borrowers, (2) the Banks and Financial Institutions listed in Schedule 1 thereto as Lenders, (3) Credit Suisse (since renamed "Credit Suisse AG") as Agent, (4) Credit Suisse (since renamed "Credit Suisse AG") as Swap Bank and (5) Credit Suisse (since renamed "Credit Suisse AG") as Security Trustee (the "**Original Loan Agreement**"), pursuant to which the Lender agreed to make various banking facilities available to the Borrower on the terms and conditions set out therein.

**WHEREAS**

(A) The Borrower has requested that the Lenders consent to certain amendments to the Original Loan Agreement including (but not limited to) the ability to defer certain Repayment Instalments (the "**Request**").

(B) This Agreement sets out the amendments to the Original Loan Agreement which the parties have agreed to make consequent upon the Request.

**IT IS AGREED AS FOLLOWS**

1. **DEFINITIONS AND INTERPRETATION**

**Definitions**

1.1 In this Agreement including its recital (unless the context otherwise requires):

    1.1.1   any terms and expressions not defined herein but whose meanings are defined in the Original Loan Agreement shall have the meanings set out therein; and

    1.1.2   "**Effective Date**" means the date on which the Lender notifies the Borrowers that the conditions referred to in Clause 3 have been met to its satisfaction.

2

1.2     The provisions of Clause 1.1 to 1.10 inclusive of the Original Loan Agreement shall extend and apply hereto as if the same were set out in full, with logical amendments.

1.3     References in the Original Loan Agreement to **"this Agreement"**, **"hereunder"**, **"herein"**, **"hereof"** and all like terms shall be read and construed to include references to the Original Loan Agreement as further amended, varied and supplemented by this Agreement.

1.4     Clause headings are for convenience of reference only and are not to be taken into account in construction.

2.      **Amendments to the Original Loan Agreement**

2.1     The parties agree that the Original Loan Agreement shall, with effect on and from the Effective Date, be (and it is hereby) amended and varied in accordance with the following provisions:

    2.1.1   the definition of **"Applicable Margin"** being deleted and replaced as follows:

        ""**Applicable Margin**" means, in relation to Tranche A, one point one zero per cent (1.10%) and, in relation to Tranche B, two point one zero per cent. (2.10%) per annum, save that for any period where any amounts due to the Lenders under Tranche A have been deferred and are outstanding pursuant to Clause 4.4, the Applicable Margin for such Deferred Amounts shall be two point one zero per cent. (2.10%) per annum;

    2.1.2   a new definition of **"Deferral Period"** being inserted as follows:

        ""**Deferral Period**" means, in relation to the Advances made pursuant to:

        (a)     Clauses 2.1.1 and 2.2.1, the period commencing on 28 March 2013 and ending on 31 January 2014; and

        (b)     Clauses 2.1.2 and 2.2.2, the period commencing on 5 April 2013 and ending on 31 January 2014;";

    2.1.3   a new definition of **"Deferred Amounts"** being inserted as follows:

        ""**Deferred Amounts**" means the maximum amount of $7,200,000 otherwise due to the Lenders pursuant to this Agreement but being deferred by operation of Clause 4.4;";

    2.1.4   a new definition of  ""**Letter of Support**" being inserted as follows:

        ""**Letter of Support**" means the letter to be issued in favour of the Security Trustee on behalf of the Lenders by a person acceptable to the Lenders in relation to additional security to be granted to the Security Trustee on behalf of the Lenders;";

    2.1.5   Clause 4.2 being deleted and replaced as follows:

"4.2    **Repayment Dates**

Subject to Clause 4.4, in relation to each Advance, the Repayment Instalments shall be paid on the Banking Days falling at successive three (3) monthly intervals from the date falling three (3) months after the Drawdown Date of such Advance, provided that where the date corresponding numerically with an applicable Drawdown Date is not a Banking Day, the relevant Repayment Date shall fall on the next succeeding Banking Day, unless that Banking Day falls in the next calendar month, in which event the Repayment Date shall be the immediately preceding Banking Day."

2.1.6   By inserting a new Clause as follows:

"4.4    **Deferral**

During the Deferral Period applicable to each Advance, repayment of the four Repayment Instalments for each Advance that would otherwise fall due during such Deferral Period shall be deferred and aggregated, and shall be paid on last day of the Deferral Period. For the avoidance of doubt, such deferral shall apply in relation to the Repayment Instalments only and this Clause 4.4 shall not be deemed to amend the provisions of this Agreement in relation to the payment of interest.";

2.1.7   by Clause 16.3.13 by deleting the word "*divided*" and replacing it with "*dividend*";

2.1.8   by inserting a new Clause 16.4 as follows:

"16.4 **Sanctions undertakings**

16.4.1  The Borrowers understand that the Lender - be it due to applicable laws or due to internal rules and regulations - is prohibited from conducting transactions, including finance transactions, with the government of or any person or entity owned or controlled by the government of Restricted Countries or Restricted Persons.

16.4.2  The Borrowers confirm and undertake that they shall not transfer, make use of or provide the benefits of any money, proceeds or services provided by or received from the Lender to any Restricted Persons or conduct any business activity (such as entering into any ship acquisition agreement, any ship refinancing agreement and/or any charter agreement) related to a vessel, project, asset or otherwise for which money, proceeds or services have been received from the Lenders with any Restricted Persons.

16.4.3  In this Clause 16.4:

"**Restricted Countries**" means Cuba, Iran, Myanmar, North Korea, Sudan and Syria and any additional countries notified by the Lender to the Borrower based on respective sanctions being imposed by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") or any of the regulative bodies referred to in the definition of Restricted Persons; and

"**Restricted Persons**" means persons, entities or any other parties (i) located, domiciled, resident or incorporated in Restricted Countries, (ii) subject to any sanction administrated by the United Nations, the European Union, the State Secretariat for Economic Affairs of Switzerland ("SECO"), OFAC, HM Treasury of the United Kingdom, the Monetary Authority of Singapore ("MAS") and the Hong Kong Monetary Authority ("HKMA") and/or any other applicable country and/or (iii) owned or controlled by or affiliated with persons, entities or any other parties as referred to in (i) and (ii)."

2.1.9   by inserting a new Clause 18.9 as follows:

"18.9   **Waiver of provisions during Deferral Period**

During the Deferral Period, subject always to no Event of Default (other than in relation to Clause 18.4) having occurred, the provisions of this Clause 18 shall not apply.";

2.1.10   by amending Clause 34.1.2 by replacing the words "*Mr John Haefelfinger*" with the words "*Ms Nadja Gautschi*";

2.1.11   by amendment Clause 34.1.4 by deleting the address and replacing it with the following:

"c/o Foresight Limited
10 Arthur Street
London
EC4R 9AR";

2.1.12   by making any consequential amendments (including but not limited to) numbering and cross-references.

2.2   The Letter of Support shall be deemed to be a Security Document for the purposes of the Original Loan Agreement.

3.   **Conditions and confirmation by the Lender**

3.1   The Lender hereby consents to the Request on the condition that the Borrowers delivers to the Agent the following documents and evidence in form and substance satisfactory to it:

3.1.1   certified copies of both board resolutions duly passed by the directors, and also by the shareholders, of the Borrowers evidencing approval of the transactions contemplated by this Agreement (together with the original of any notarised and apostilled or legalised power of attorney issued pursuant to such resolutions) in such form as the Lender may require;

3.1.2   an original of this Agreement signed by the Borrowers and acknowledged by the Corporate Guarantor;

3.1.3   the following documents in form and substance acceptable to the Agent:

(a)   an amendment to the Mortgages over the Vessels, in each case exhibiting the Original Loan Agreement as amended by this Agreement; and

(b)   the Letter of Support,

in each case with all notices and schedules referred to therein, in a form acceptable to the Agent and, where so required by the Agent, registered and/or otherwise notified to such parties as the Agent may specify;

3.1.4   evidence, satisfactory to the agent, of the registration of the amendments to the Mortgages referred to above with the Liberian ship registry; and

3.1.5   such legal opinions as the Lender shall require,

and accordingly neither the Lender's consent to the Request nor this Agreement shall be effective until the Effective Date.

3.2   The Agent and Borrowers agree and confirm that the amount of US$5,000,000 pledged with the Agent in support of the obligations of the Borrowers under the Original Loan Agreement shall be unaffected by the terms of this Agreement and shall in all respects remain pledged on the terms previously agreed between the Agent and the Borrowers.

3.3   The consent of the Lender contained in this Agreement shall be further subject to no Event of Default under the Agreement having occurred on the Effective Date.

## 4.   Confirmation

Each party to this Agreement agrees, for the avoidance of doubt, that the Original Loan Agreement (as amended by and varied by this Agreement) and each of the other Security Documents to which it is a party, shall remain in full force and effect notwithstanding the terms of this Agreement and shall continue to secure the Outstanding Indebtedness.

## 5.   Costs and Expenses

The Borrowers undertake to indemnify the Lenders on demand in respect of all costs, charges and expenses including, without limitation, legal fees (together with value added tax or any similar tax thereon, if applicable) incurred by the Lenders in

connection with the negotiation, preparation, printing and execution of this Agreement.

6.      **Counterparts**

This Agreement may be executed in any number of counterparts each of which shall be deemed to be an original and, when executed, all such counterparts taken together shall be deemed to constitute one and the same instrument.

7.      **Governing Law and Jurisdiction**

This Agreement shall be governed by and construed in accordance with English law and the provisions of Clauses 34 and 35 of the Original Loan Agreement shall extend and apply hereto as if the same were set out in full herein with any necessary modifications.

**IN WITNESS** whereof the parties to this Agreement have caused this Agreement to be duly executed on the date first above written.

## EXECUTION PAGE

### THE BORROWERS

| | | |
|---|---|---|
| **SIGNED** | ) | |
| by | ) | |
| duly authorised for and on behalf of | ) | Philippa D Wright |
| **PORLOCK MARITIME COMPANY** | ) | Attorney in Fact |
| **LIMITED** | ) | |

| | | |
|---|---|---|
| **SIGNED** | ) | |
| by | ) | |
| duly authorised for and on behalf of | ) | Philippa D Wright |
| **TREMAIN SHIPPING COMPANY** | ) | Attorney in Fact |
| **LIMITED** | ) | |

### THE LENDERS

| | | |
|---|---|---|
| **SIGNED** | ) | |
| by | ) | |
| duly authorised for and on behalf | ) | JUSDEEP KAUR BHOGAL |
| of **CREDIT SUISSE AG** | ) | ATTORNEY - IN - FACT |

### THE AGENT

| | | |
|---|---|---|
| **SIGNED** | ) | |
| by | ) | |
| duly authorised for and on behalf | ) | JUSDEEP K. BHOGAL |
| of **CREDIT SUISSE AG** | ) | ATTORNEY - IN - FACT |

### THE SWAP BANK

| | | |
|---|---|---|
| **SIGNED** | ) | |
| by | ) | |
| duly authorised for and on behalf | ) | JUSDEEP K. BHOGAL |
| of **CREDIT SUISSE AG** | ) | ATTORNEY - IN - FACT |

### THE SECURITY TRUSTEE

| | | |
|---|---|---|
| **SIGNED** | ) | |
| by | ) | |
| duly authorised for and on behalf | ) | JUSDEEP K. BHOGAL |
| of **CREDIT SUISSE AG** | ) | ATTORNEY - IN - FACT |

8

## ACKNOWLEDGED AND ACCEPTED BY THE CORPORATE GUARANTOR

We acknowledge receipt of the above and accept its terms in full and confirm that our guarantee of the obligations of the Borrowers remains in full force and effect notwithstanding the same.

FLAVIAN D'SOUZA
ATTORNEY IN FACT.

............................

**Mandate Shipping Company Limited**